Docket No. 103332.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

---

MITCHELL M. ISEBERG, Indiv. and as an Officer and Director of the Leikam Farm Development Corporation, *et al.*, Appellants, v. SHELDON GROSS, Indiv. and as an Officer, Director, Partner, Agent, and/or Joint Adventurer of the Vernonshire Auto Laundry Group, Inc., *et al.*, Appellees.

*Opinion filed September 20, 2007.*

JUSTICE BURKE delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Fitzgerald, Kilbride, Garman, and Karmeier concurred in the judgment and opinion.

Justice Freeman took no part in the decision.

## OPINION

In this interlocutory appeal, plaintiffs, Mitchell Iseberg (Iseberg) and his wife, Carol, seek reversal of the order dismissing with prejudice count I of their third amended complaint, brought against defendants, Sheldon Gross (Gross) and Henry Frank (Frank). In count I, plaintiffs alleged that Gross and Frank were negligent because they failed to warn Iseberg that a former mutual business partner, Edward Slavin (Slavin), had made threats against Iseberg's life. Slavin later acted on his threats and shot Iseberg, rendering him a paraplegic.

The trial court dismissed the claim pursuant to section 2–615 of the Code of Civil Procedure (735 ILCS 5/2–615 (West 2002)), finding that plaintiffs failed to state a cause of action because, under the facts alleged, Gross and Frank owed no duty to warn Iseberg or to protect him from the criminal conduct of Slavin. A divided appellate court affirmed the dismissal. 366 Ill. App. 3d 857.

For reasons that follow, we affirm the judgment of the appellate court.

BACKGROUND

The facts of this case are taken from plaintiffs' complaint and the documents attached thereto. They are not materially in dispute.

In 1995, Slavin and Gross formed the Vernonshire Auto Laundry Group, Inc. (VAL), an Illinois corporation created for the purpose of developing Slavin's idea of building a car wash in the Vernon Hills-Lincolnshire area. Thereafter, Gross contacted Iseberg, an attorney and real estate broker, who Gross had learned was in the process of purchasing land in the Vernon Hills area (the Leikam Farm property). Iseberg planned to purchase the Leikam Farm property and develop it into a strip mall. To that end, Iseberg had joined with Frank to form the Leikam Farm Development Corporation (LFD).

In October 1996, VAL and LFD entered into a partnership agreement, with each contributing funds toward the purchase of the Leikam Farm property. Title to the property was then placed in a land trust, with VAL and LFD each having 50% beneficial ownership in the trust. The partnership agreement included a provision that VAL could purchase LFD's interest in the trust if the partnership was not terminated by April 15, 1997.

On April 14, 1997, VAL tendered an offer to purchase LFD's beneficial interest in the trust. LFD refused to sell. Previously LFD, without VAL's knowledge, had assigned its 50% beneficial interest in the land trust to Frank and executed a promissory note in the amount of $352,000 in Frank's favor. VAL filed suit against LFD to enforce its rights under the partnership agreement. This legal suit was settled

-2-

in September 1997 when the parties entered into a "Settlement and Joint Venture Agreement."[1]

Pursuant to the agreement, Frank, VAL, Gross and Slavin, wanted "to eliminate all Iseberg involvement with respect to the Property." Therefore, the settlement provided for the termination of the VAL-LFD partnership and the creation of the Leikam Farm Joint Venture (Venture), which had as its sole purpose the sale of the Leikam Farm property. The settlement agreement specifically provided that Iseberg was not to be a party to the Venture, that LFD's and Iseberg's interests, if any, in the property and the land trust were terminated, and that Iseberg shall "[d]eliver all business, financial and accounting records relating to the [Leikam Farm] Property to the Venture and shall cease and desist from having any involvement with the Property, its development or its future transactions unless as requested in writing by the Venture, and then at Iseberg's discretion other than as an attorney for a third party."[2]

Despite the Venture's efforts, the Property was not sold by December 31, 1998, when monthly interest payments on the mortgage note for the property came due. Slavin, having already invested all of his savings in the project, was unable to meet his share of the monthly interest obligation. As a result, in February 1999, Slavin was forced to surrender his interest in the property, losing his entire investment.

Plaintiffs alleged that Slavin's financial demise caused him to become mentally unbalanced and that Slavin focused his anger on

---

[1]A copy of this settlement was attached to, and made part of, Iseberg's complaint.

[2]Notwithstanding the express provisions of the settlement agreement, Iseberg alleged in his complaint that, from September 12, 1997, through January 2000, Frank "requested and utilized Iseberg's legal skills and real estate marketing and development expertise" with respect to the Leikam Farm Joint Venture and that this was done with the knowledge and approval of Gross, Slavin and the Venture. Iseberg further alleged that his services included: reviewing proposals; suggesting changes to certain real estate sales agreements; giving legal opinions on zoning issues, easement restrictions, and water retention issues; negotiating solicitations for the Leikam Farm property; and drafting a sales contact for the property.

Iseberg, whom he blamed for his financial situation. According to statements Gross gave to the Lake County police,[3] Slavin spoke to Gross on several occasions between the fall of 1998 and the early months of 1999 about wanting to harm Iseberg. In the beginning, Slavin talked about punching Iseberg in the face with brass knuckles. But as time passed and Slavin became more agitated, he talked about wanting to find a "hit man" and, later, he outlined a plan for killing Iseberg himself and then committing suicide. Slavin told Gross that, once the suicide exemption clause in his life insurance policy was no longer in effect, he would go to Iseberg's home, ring the doorbell, shoot Iseberg, and then kill himself so his family could collect his insurance. On at least one occasion, Slavin spoke about a plan that included killing Frank as well. Slavin also told Gross that he had purchased a gun and asked whether the caliber was large enough to kill someone.

Gross contacted Slavin's brother, Earl, to express his concerns about Slavin's threats. Gross suggested, more than once, that Earl obtain psychiatric help for his brother. Earl always demurred, assuring Gross that Slavin would never act on his threats. Gross told Frank about the threats, but neither Gross nor Frank told Iseberg.

According to Gross' statements to the police, after Slavin surrendered his interest in the Leikam Farm property in February 1999, Gross had almost no contact with Slavin. Gross said he spoke to Slavin on only three occasions over the next 11 months. Although Slavin voiced no more threats against Iseberg during this time, on one occasion Slavin asked Gross if he knew Iseberg's new address. Gross said he told Slavin he did not know the address and would not give it to him if he did.

On January 24, 2000, Slavin rang the doorbell at Iseberg's residence. When Iseberg answered the door, Slavin shot him four times. Iseberg was not killed, but was rendered a paraplegic.

In October 2001, Mitchell and Carol Iseberg filed a complaint, which was later amended to include claims against Gross and Frank.

---

[3]After Iseberg was shot, Gross gave statements to the Lake County Major Crime Task Force concerning Slavin's threats toward Iseberg. These police reports were attached to and made a part of Iseberg's complaint.

The third amended complaint, which is at issue here, sought recovery from Gross and Frank for negligence (count I), negligent performance of a voluntary undertaking (count II), breach of fiduciary duty (counts III and IV), civil conspiracy (count V) and loss of consortium (count VI).

In the negligence count, it was alleged that Iseberg was "a former partner and joint adventurer" of both Gross and Frank and that he was "the current agent, attorney, and co-adventurer" of the Leikam Farm Joint Venture "with respect to the sale and/or development of the Leikam Farm property." It was not alleged, however, that a duty arose because of these relationships. Rather, the complaint alleged that Gross and Frank had "actual, independent and superior knowledge" that Slavin blamed Iseberg for Slavin's financial demise, that Slavin had threatened to kill Iseberg, and that he had purchased a gun. It was further alleged that, based on this knowledge, Gross and Frank "were in a unique position to prevent the harm done to Iseberg" by either communicating the threats to Iseberg or by contacting the police. Plaintiffs then asserted that, because of this knowledge, Gross and Frank owed a duty to warn and protect Iseberg, which they breached by failing to tell Iseberg about Slavin's threats.

In an order dated August 13, 2004, the trial court dismissed with prejudice the counts alleging negligence, negligent performance of a voluntary undertaking, and civil conspiracy. In a subsequent order, the trial court held, pursuant to Supreme Court Rule 304(a), that there was no just reason to delay appeal of its August 13, 2004, order. Thereafter, plaintiffs brought an interlocutory appeal in the appellate court seeking reversal of the dismissal order with respect to counts I (negligence) and II (negligent performance of a voluntary undertaking). The claims alleging breach of a fiduciary duty against Frank (count III) and Gross (count IV) and loss of consortium (count VI) were stayed pending appeal.

On appeal, the appellate court affirmed the dismissals, with one justice dissenting. 366 Ill. App. 3d 857. With respect to count I, the appellate court majority held that, under Illinois law, the general rule is that one does not have an affirmative duty to protect another against criminal attack by third persons. The court noted that Illinois recognizes four exceptions to the general no-duty rule, but that plaintiffs' "superior knowledge theory" was not one of those

exceptions. Finding that this theory did not provide a basis for imposing a duty on defendants, the majority affirmed the dismissal of the negligence claim. 366 Ill. App. 3d at 862-63. One justice dissented in part, stating that "the allegations of the third amended complaint establish the necessary elements for the application of the principal/agent exception to the general rule." 366 Ill. App. 3d at 866 (Hall, J., concurring in part and dissenting in part).

We granted plaintiffs' petition for leave to appeal. In addition, we granted leave to the Pacific Legal Foundation to file an *amicus curiae* brief. The *amicus* brief is not offered in support of either party, but advocates judicial restraint in the expansion of legal theories and remedies.


ANALYSIS

Before this court, plaintiffs' only challenge is to the dismissal of count I, the claim charging Gross and Frank with negligence for their failure to warn Iseberg of Slavin's threats. The circuit court dismissed this count pursuant to defendants' section 2–615 motions (735 ILCS 5/2–615 (West 2002)), finding that the facts alleged in the complaint failed to establish any basis for imposing a duty on defendants to warn or protect Iseberg from the criminal conduct of Slavin. Orders granting or denying section 2–615 motions are reviewed *de novo*. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006); *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 364 (2004); *Ferguson v. City of Chicago*, 213 Ill. 2d 94, 96-97 (2004).

When conducting our review, all well-pleaded facts and all reasonable inferences that may be drawn from those facts must be taken as true and allegations in the complaint must be construed in a light most favorable to the plaintiff. *King v. First Capital Financial Services Corp.*, 215 Ill. 2d 1, 11-12 (2005); *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 490-91 (1996). A claim should not be dismissed pursuant to section 2–615 unless no set of facts can be proved which would entitle the plaintiffs to recover. *Marshall*, 222 Ill. 2d at 429. However, because Illinois is a fact-pleading jurisdiction, plaintiffs must allege facts, not mere conclusions, to establish their claim as a viable cause of action. *Marshall*, 222 Ill. 2d at 429-30; *Vernon v. Schuster*, 179 Ill. 2d 338, 344 (1997).

To state a legally sufficient claim of negligence, the complaint must allege facts establishing the existence of a duty of care owed by the defendants to the plaintiffs, a breach of that duty, and an injury proximately caused by that breach. *Bajwa v. Metropolitan Life Insurance Co.*, 208 Ill. 2d 414, 421 (2004); *Hills v. Bridgeview Little League Ass'n*, 195 Ill. 2d 210, 228 (2000). Whether a duty is owed is a question of law for the court to decide, while breach and proximate cause are factual matters for the jury. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 43-44 (2004); *Chandler v. Illinois Central R.R. Co.*, 207 Ill. 2d 331, 340 (2003); *Kirk v. Michael Reese Hospital & Medical Center*, 117 Ill. 2d 507, 525 (1987); *Pelham v. Greisheimer*, 92 Ill. 2d 13 (1982).

Because of the procedural posture of this case, the only issue before us is whether a legal duty existed. Plaintiffs do not allege that defendants owed a duty by virtue of any contract or statute. Rather, they seek to hold defendants liable for negligence under common law principles.

This case presents a question of "duty" in its most basic or "primary" sense, *i.e.*, duty as obligation. See *Marshall*, 222 Ill. 2d at 436, citing J. Goldberg & B. Zipursky, *The Restatement (Third) and the Place of Duty in Negligence Law*, 54 Vand. L. Rev. 657 (2001). What we must decide is whether Iseberg and defendants stood in such a relationship to one another that the law imposed on defendants an obligation of reasonable conduct for the benefit of Iseberg. *Bajwa*, 208 Ill. 2d at 421-22; *Bucheleres v. Chicago Park District*, 171 Ill. 2d 435 (1996). Under common law, the universally accepted rule, articulated in section 314 of the Restatement (Second) of Torts, and long adhered to by this court, is that a private person has no duty to act affirmatively to protect another from criminal attack by a third person absent a "special relationship" between the parties. See *Rowe v. State Bank of Lombard*, 125 Ill. 2d 203 (1988); Restatement (Second) of Torts §§314, 314A (1965); E. Kellett, Comment Note: *Private Person's Duty and Liability for Failure to Protect Another Against Criminal Attack by Third Person*, 10 A.L.R.3d 619 (1966). Historically, there have been four "special relationships" which this and other courts have recognized, namely, common carrier-passenger, innkeeper-guest, business invitor-invitee, and voluntary custodian-protectee. *Marshall*, 222 Ill. 2d at 438; Restatement (Second) of

Torts §314A (1965). When one of these special relationships exists between the parties and an unreasonable risk of physical harm arises within the scope of that relationship, an obligation may be imposed on the one to exercise reasonable care to protect the other from such risk, if the risk is reasonably foreseeable, or to render first aid when it is known that such aid is needed. See *Fancil v. Q.S.E. Foods, Inc.*, 60 Ill. 2d 552, 559-60 (1975); Restatement (Second) of Torts §314A (1965). The existence of one of these four "special relationships" has typically been the basis for imposing an affirmative duty to act where one would not ordinarily exist.[4]

In the case at bar, plaintiffs do not allege that one of the above-listed "special relationships" existed. Nor do they contend in this court, as they did in their third-amended complaint, that a duty arose from defendants' "superior knowledge" of Slavin's threats. Instead, plaintiffs ask us to find, as did the dissenting appellate justice, that the facts alleged in the third amended complaint, viewed in a light most favorable to them, are sufficient to bring this case within an exception to the no-affirmative-duty rule. Specifically, plaintiffs now claim that the facts alleged in the third amended complaint sufficiently establish that, at the time of the shooting, Iseberg was an agent of both Gross and Frank with respect to the Leikam Farm Property Venture and, as a result of this relationship and in accordance with section 471 of the Restatement (Second) of Agency, Gross and Frank owed a duty to warn Iseberg of Slavin's threats.

Plaintiffs also advance a second argument. Plaintiffs contend that decisions of this court have demonstrated that the "special relationship" doctrine is no longer the *sine qua non* for determining whether to impose an affirmative duty to protect against the tortious acts of a third party. Rather, plaintiffs contend, in situations where some type of relationship exists between the parties (*i.e.*, where the parties are not mere strangers), whether an affirmative duty may be imposed will be decided based upon consideration of the four

---

[4]We note that the Restatement (Third) of Torts: Liability for Physical Harm §40, Proposed Final Draft No.1 (April 6, 2005), has added employer-employee, school-student, and landlord-tenant as additional "special relationships."

traditional negligence factors: foreseeability, likelihood of injury, magnitude of the burden, and consequences of placing the burden on the defendants. Plaintiffs urge us to clarify that this is the current status of the law of this state and to apply this analysis to find a duty in this case. Alternatively, plaintiffs argue that, if we find that the "special relationship" analysis has not already been discarded, we should take this opportunity to do so now because the no-affirmative-duty rule is out of step with modern notions of morality.

Principal-Agent Relationship and the Duty to Warn

As noted above, plaintiffs' initial argument is that the negligence count should not have been dismissed because this case fits within an exception to the no affirmative duty rule. Specifically, plaintiffs rely on section 471 of the Restatement (Second) of Agency (Restatement (Second) of Agency §471 (1958)), to assert that defendants owed a duty to warn Iseberg of Slavin's threats.

This court has never before addressed the application of section 471 of the Restatement (Second) of Agency, although our appellate court has. See *MacDonald v. Hinton*, 361 Ill. App. 3d 378 (2005); *Petersen v. U.S. Reduction Co.*, 267 Ill. App. 3d 775 (1994). Section 471 provides as follows:

> "A principal is subject to liability in an action of tort for failing to use care to warn an agent of an unreasonable risk involved in the employment, if the principal should realize that it exists and that the agent is likely not to become aware of it, thereby suffering harm." Restatement (Second) of Agency §471, at 405 (1958).

Comment *a*, following this section, explains the rationale for the rule:

> "One who is requested or directed by another to act on his account has reason to believe that the other will give him information of the risks to be encountered of which the other knows and which he should realize are unknown to the one so requested to act. Further, if the one making the request is in a better position to know of the risks to be encountered, the one of whom the request is made may reasonably believe that he will be informed of facts which the other, because of his

position, should know. From this it follows that a principal requesting or directing an agent to act is under a duty to disclose to the agent the risks which he knows or should know are likely to be encountered by the agent [in performing the requested acts.]"[5] Restatement (Second) of Agency §471, Comment *a*, at 405 (1958).

Applying this rationale, courts which have found a duty to warn in reliance on section 471 of the Restatement (Second) of Agency have treated the duty as an extension of an employer's general obligation to provide a safe workplace for his employees. See, *e.g.*, *Blake v. Consolidated R. Corp.*, 176 Mich. App. 506, 516, 439 N.W.2d 914, 919 (1989) (railroad was held liable to the estates of three railroad employees who were murdered by an individual known to be carrying out a vendetta against the railroad based on court's finding that railroad had a duty to warn and protect its employees from criminal assault against them during the course of employment; duty could be inferred from employer's duty to provide a safe workplace for its employees); *Dahlgren v. Coe*, 311 Mass. 18, 40 N.E.2d 5 (1942) (employer liable for injuries to laundress scalded by hot water when employer knew water was excessively heated but did not warn laundress).

In the case at bar, plaintiffs contend that the facts alleged in their third amended complaint support a finding that a principal-agent relationship existed between Iseberg and defendants at the time of Iseberg's injury and that, as a result of that relationship, defendants had a duty to warn, as set forth in section 471 of the Restatement (Second) of Agency. We disagree.

The complaint alleges that Iseberg was defendants' former partner and joint adventurer, as well as the current agent, attorney, and coadventurer of the defendants and the Leikam Farm Joint Venture

---

[5]An additional purpose for imposing a duty of warning on principals is to permit the agent to make an informed decision about whether he wishes to continue to maintain the agency relationship and assume the risk that it entails, or terminate the relationship. See Restatement (Second) of Agency §471, Comment *a*, at 405 (1958) ("if the agent becomes aware of the risks before it is too late for him to withdraw, the principal's liability terminates").

with respect to the sale and/or development of the Leikam Farm property. The complaint further alleges that Iseberg provided legal, brokerage, development, and marketing services to defendants and the Venture with respect to the Leikam Farm property from September 1997 through January 2000. Plaintiffs now contend that these allegations in their complaint sufficiently establish the existence of a principal-agent relationship between defendants and Iseberg at the time of Iseberg's injury.

As defendants point out, however, the allegations in plaintiffs' complaint which support a finding that an agency relationship existed are directly contradicted by the documents attached to the complaint. For example, plaintiffs' assertions that Iseberg acted as an attorney and/or brokerage agent for the Leikam Farm Joint Venture are belied by the terms of the settlement, which specifically provide that Iseberg was not to have any involvement in the Leikam Farm property unless requested by the Venture *in writing*. Plaintiffs do not allege that Iseberg was ever authorized, in writing, to represent the interests of the Venture.

Defendants also argue that, even if we accept as true plaintiffs' allegations that Iseberg provided professional legal and brokerage advice to defendants and the Venture during the relevant time period, we should find that Iseberg was acting as an independent contractor and, for this reason, the allegations in the complaint fail to demonstrate that a principal-agent relationship existed between Iseberg and the defendants. While it may be true that Iseberg was an independent contractor rather than defendants' agent (see *Petersen v. U.S. Reduction Co.*, 267 Ill. App. 3d at 782-85), we need not decide whether plaintiffs' complaint sufficiently alleged the existence of an agency relationship. Even if the allegations in plaintiffs' complaint supported a finding that Iseberg had been, in some capacity, defendants' agent during the relevant time period, it would not alter our determination with regard to the duty to warn.

The duty to warn, identified in section 471 of the Restatement (Second) of Agency, does not arise unless the unreasonable risk of harm is "involved in the employment." See *MacDonald v. Hinton*, 361 Ill. App. 3d at 385 (to state a claim for negligent failure to warn of a risk "involved in the employment," the risk must arise from the particular nature of the employment). To understand what it means to

be "involved in the employment," we turn to comment *b* of section 471 of the Restatement Second (Agency). There, the Restatement sets forth an example of a situation where a principal might be held liable for physical harm to his agent based on the principal's breach of his duty of disclosure. Comment *b* provides that a landlord may be held liable if he directs his agent to collect rent from a tenant without warning the agent that the tenant has a propensity to assault rent collectors and the agent, while collecting rent, is physically assaulted by the tenant. Also, an illustration following comment *b* provides that P may be subject to liability to A where P claims title to land occupied by T, P directs A to work the land without warning A that T has threatened to "resist by force" attempts by anyone to work the land, and T shoots A while A is working the land.

In the case at bar, plaintiffs do not suggest that Iseberg encountered a risk of harm because of any task Iseberg was directed to perform by defendants. Nor was Iseberg injured while he was performing any tasks for defendants. Slavin attacked Iseberg at Iseberg's home. As noted above, the complaint alleged that the reason for the attack was that Slavin blamed Iseberg for the financial losses Slavin experienced. Those financial losses were the result of the inability to sell the Leikam Farm property. Plaintiffs do not allege that the inability to sell the property was due to anything Iseberg did in his capacity as the purported agent of Gross and Frank.

Based on the facts alleged in plaintiffs' complaint, the risk of harm to Iseberg which Slavin posed did not "arise from the particular nature" of Iseberg's alleged agency relationship with Gross and Frank. See *MacDonald v. Hinton*, 361 Ill. App. 3d at 385. We conclude, then, that the risk of harm was not "involved in" Iseberg's employment within the meaning of section 471 of the Restatement (Second) of Agency. The duty to warn, which may be owed by a principal to his agent, as provided in section 471 of the Restatement (Second) of Agency, was not implicated under the facts of this case.

Abandoning the "Special Relationship" Doctrine

As noted above, in arguing that their negligence claim should not have been dismissed, plaintiffs offer an alternative argument. They contend that our recent case law demonstrates that the "special

relationship" doctrine has been eroded in this state and that "the evolution of our case law has clearly been away from the formulaic application of the special relationship doctrine." Plaintiffs argue that the "special relationship" doctrine, in particular, and the no-duty rule, in general, are "antiquated" and out of step with contemporary societal morals. Thus, according to plaintiffs, the existence of an affirmative duty to warn or protect, particularly in situations where the parties are not strangers, should be a policy determination, made on a case-by-case basis, upon consideration of factors commonly used to determine the existence of a duty in ordinary negligence situations, *i.e.*, the reasonable foreseeability of the injury; the likelihood of the injury; the magnitude of the burden of guarding against the injury; and the consequences of placing that burden on the defendants. Plaintiffs urge us to abandon the "special relationship" framework for determining whether to impose an affirmative duty to protect against third-party attacks and to find a duty in the case at bar by applying the above four-factor negligence test.

Earlier in this opinion, we noted this court's long history of adherence to the rule that private persons owe no duty to act affirmatively to protect others from criminal attack by a third persons absent a "special relationship" between the parties. *Rowe v. State Bank of Lombard*, 125 Ill. 2d 203 (1988); *Fancil v. Q.S.E. Foods, Inc.*, 60 Ill. 2d 552 (1975); *Neering v. Illinois Central R.R. Co.*, 383 Ill. 366 (1943); Restatement (Second) of Torts §§314, 314A (1965). Abandonment of this rule, therefore, would necessarily implicate *stare decisis*. We held in *Chicago Bar Ass'n v. Illinois State Board of Elections*, 161 Ill. 2d 502, 510 (1994):

> "The doctrine of *stare decisis* is the means by which courts ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion. *Stare decisis* permits society to presume that fundamental principles are established in the law rather than in the proclivities of individuals. The doctrine thereby contributes to the integrity of our constitutional system of government both in appearance and in fact. *Stare decisis* is not an inexorable command. However, a court will detour from the straight path of *stare decisis* only for articulable reasons, and only when the court must bring its decisions into agreement with experience and

-13-

newly ascertained facts. *Vasquez* v. *Hillery* (1986), 474 U.S. 254, 265-66, 88 L. Ed. 2d 598, 610, 106 S. Ct. 617, 624-25."

Plaintiffs contend that we would not be straying very far from the path of *stare decisis* because the "special relationship" doctrine has already been eroded by Illinois courts, including this court, which have eschewed the "special relationship" analysis and, instead, applied the traditional negligence factors when deciding whether a duty exists. Plaintiffs cite as examples *Happel v. Wal-Mart Stores, Inc.,* 199 Ill. 2d 179 (2002), *Bajwa v. Metropolitan Life Insurance Co.*, 208 Ill. 2d 414 (2004), *Kohn v. Laidlaw Transit, Inc.*, 347 Ill. App. 3d 746 (2004), and *Orrico v. Beverly Bank*, 109 Ill. App. 3d 102 (1982). However, we find that these cases do not support plaintiffs' erosion theory. In none of these cases was the question at issue whether an affirmative duty should be imposed on a person to warn or protect another against the criminal acts of a third party.

In *Happel*, the plaintiff, a regular customer of the defendant's pharmacy, brought suit because the pharmacy dispensed to her a prescription medication which was contraindicated based on her allergy to aspirin. The pharmacy maintained a computer database that was programmed to alert the pharmacist if a contraindicated medication was accidentally prescribed by a customer's physician and this database contained the plaintiff's allergy information. Although the pharmacy knew or should have known of the contraindication, it dispensed the medication without any warning either to the customer or to the prescribing physician. Based on these special circumstances, we affirmed the appellate court's finding of a narrow duty to warn, which was encompassed within the pharmacist's duty of ordinary care. *Happel*, 199 Ill. 2d at 189.

In *Bajwa*, a wrongful-death claim was brought against the defendant insurance company, alleging that the defendant had negligently issued an insurance policy on the life of the plaintiffs' decedent, who had been murdered for the proceeds of that policy. The alleged facts established that the defendant's agent had misrepresented on the policy application that he had witnessed the proposed insured's signature, although he had not, in fact, done so.

As a result, a life insurance policy was issued in favor of a beneficiary who did not possess an insurable interest and the insured was never seen personally or provided notice of the policy. We held

-14-

that an insurer had a duty to refrain from providing " 'coverage on someone's life without undertaking reasonable precautions to ascertain whether the insured [was] aware of and [had] consented to the issuance of the policy.' " *Bajwa*, 208 Ill. 2d at 427, quoting *Bajwa v. Metropolitan Life Insurance Co.*, 333 Ill. App. 3d 558, 578 (2002).

In *Kohn*, the plaintiff alleged that a school bus driver employed by the defendant transit company had been negligent because she failed to extend the mechanical arm and stop sign on the bus when she dropped off a minor-passenger. The plaintiff further alleged that, as a result of that negligence, he proceeded past the bus, struck the minor, and then was, himself, attacked by bystanders as he attempted to assist the minor. The plaintiff brought suit against the transit company to recover for injuries he suffered at the hands of the bystanders, which the plaintiff claimed were proximately caused by the defendant's negligent operation of the bus. Although the defendant argued that it owed no duty to protect the plaintiff from third-party attacks absent a "special relationship," the court addressed the plaintiff's claim that a duty arose because the defendant's negligence caused the attack. In response to that argument, the court considered the four negligence factors and found that a physical attack was not a foreseeable consequence of the defendant's negligent conduct. *Kohn*, 347 Ill. App. 3d at 755.

Finally, in *Orrico*, a 31-year-old mentally disabled man was found murdered shortly after he withdrew a large sum of money from his account at the defendant's bank. When the bank dispensed the money to the decedent, it had in its possession a court order appointing the plaintiff (the decedent's mother) conservator of the decedent's account. In addition, the bank had actual knowledge that the plaintiff did not want the decedent to have access to his funds. Based on these circumstances, it was held that the defendant had an obligation to dispense the decedent's funds in a manner which was not "in contravention of the court-appointed conservator's demands." *Orrico*, 109 Ill. App. 3d at 106.

Unlike the case at bar, *Happel*, *Bajwa*, *Kohn* and *Orrico* are not affirmative duty cases. In each instance, it was the defendants' negligent affirmative conduct (dispensing medication, issuing a life insurance policy, failing to extend the mechanical stop sign, dispensing money) which was alleged to have created or contributed to the risk

of harm to plaintiff. See Restatement (Third) of Torts: Liability for Physical Harm, §37, Comment *d*, Proposed Final Draft No.1 (April 6, 2005) (when defendant's conduct creates the risk of harm, an affirmative duty of reasonable care exists. This duty is not imposed as an exception to the no-duty rule, but derives from the general duty of ordinary care which an actor owes when his affirmative conduct creates the risk); see also D. Robertson, *Negligence Liability for Crimes and Intentional Torts Committed by Others*, 67 Tul. L. Rev. 135 (1992) (discussion therein of the difference between conduct that creates a risk and exceptions to the no-duty rule). For this reason, *Happel*, *Bajwa*, *Kohn*, and *Orrico* are inapposite.

Further, we can find no case in which this court has recognized an affirmative duty, based upon consideration of the four factors cited by plaintiffs, in the absence of a special relationship. Rather, the special relationship doctrine has been cited by this court in a number of recent cases, indicating our continued adherence to its general principles. See, *e.g.*, *Marshall v. Burger King Corp.*, 222 Ill. 2d 422 (2006); *Young v. Bryco Arms*, 213 Ill. 2d 433 (2004); *Hills v. Bridgeview Little League Ass'n*, 195 Ill. 2d 210 (2000). Accordingly, we reject plaintiffs' claim that the "special relationship" doctrine has been eroded in Illinois.

Plaintiffs only remaining argument for abandoning the "special relationship" doctrine is that the doctrine and the no-duty rule, in general, are antiquated and out-of-step with today's morality. While it is true that the no-duty rule has suffered criticism from a number of legal scholars, criticism of the rule is not new. Legal pundits have assailed the rule, citing its lack of social conscience, for as long as it has existed. See Restatement (Third) of Torts: Liability for Physical Harm §37, Comment *e*, Proposed Final Draft No.1 (April 6, 2005); J. Adler, *Relying upon the Reasonableness of Strangers: Some Observations About the Current State of Common Law Affirmative Duties to Aid or Protect Others*, 1991 Wis. L. Rev. 867, 867 (1991) ("For more than eighty years, commentators have argued about whether courts should require one to act affirmatively to protect a stranger in peril").

Plaintiffs cite *Soldano v. O'Daniels*, 141 Cal. App. 3d 443, 190 Cal. Rptr. 310 (1983) and *Lombardo v. Hoag*, 237 N.J. Super. 87, 566 A.2d 1185 (1989), in support of their position that the current

-16-

trend in the law is toward the abandonment of the no-duty rule and "special relationship" exceptions. But *Lombardo*, and the affirmative duty it recognized, were expressly overruled in *Lombardo v. Hoag*, 269 N.J. Super. 36, 634 A.2d 550 (1993), and *Soldano*, though not overruled, has not been well received. Subsequent California courts have criticized the *Soldano* opinion, limiting it to its specific facts. See Restatement (Third) of Torts: Liability for Physical Harm §37, Reporter's Note, at 718, Proposed Final Draft No.1 (April 6, 2005).

Contrary to plaintiffs' assertions, the no-affirmative-duty rule, as a common law tort principle, has been retained in every jurisdiction. See Restatement (Third) of Torts: Liability for Physical Harm §37, Reporter's Note, at 719, Proposed Final Draft No.1 (April 6, 2005) ("no court has adopted an affirmative duty to assist in a rescue"); J. Adler, *Relying upon the Reasonableness of Strangers: Some Observations About the Current State of Common Law Affirmative Duties to Aid or Protect Others*, 1991 Wis. L. Rev. 867, 868 (1991) ("But in spite of early and repeated calls for reform, no recorded case has expressly adopted the requirement–which at first blush would appear to be relatively harmless–that people have a responsibility to engage in even an "easy rescue"). Some states have legislatively created narrow exceptions to the no-affirmative-duty rule, imposing criminal sanctions if a person who is present when certain violent crimes are taking place fails to notify police or, in some instances, fails to render assistance to the victim.[6] However, none of these statutes

---

[6]Some states have enacted laws imposing criminal sanctions if a person, present at the scene, fails to notify police that a sexual assault (Florida, Massachusetts, Rhode Island) or other violent crime (Vermont, Minnesota, Ohio, Washington, and Wisconsin) is taking place; Wisconsin permits one who witness a violent crime to either notify police or render assistance to the victim; two states (Rhode Island and Vermont) require one who is present at the scene of a violent crime to render "reasonable assistance" to persons known to be exposed to grave physical harm, when the provision of such aid can be accomplished without danger to oneself or others. See S. Heyman, *Foundations of the Duty to Rescue*, 47 Vand. L. Rev. 673, 689 n.66 (1994).

provide for a civil cause of action.[7] Thus, given the wide acceptance of the no duty rule and the "special relationship" doctrine, it cannot be said that they are "antiquated" or "outmoded."

Moreover, abandonment of the no-duty rule would create a number of practical difficulties–defining the parameters of an affirmative obligation and enforcement, to name just two. See *Rhodes v. Illinois Central Gulf R.R.*, 172 Ill. 2d 213, 234 (1996). See also S. Heyman, *Foundations of the Duty to Rescue*, 47 Vand. L. Rev. 673, 675 (1994). As noted by Prosser and Keeton,

> "the difficulties of setting any standards of unselfish service to fellow men, and of making any workable rule to cover possible situations where fifty people might fail to rescue one, has limited any tendency to depart from the rule to cases where some special relation between the parties has afforded a justification for the creation of a duty, without any question of setting up a rule of universal application." W. Keeton, Prosser & Keeton on Torts §56, at 376 (5th ed. 1984).

In *Rhodes*, we said, "the impracticality of imposing a legal duty to rescue between parties who stand in no special relationship to each other would leave us hesitant to do so." *Rhodes*, 172 Ill. 2d at 234. That statement is no less true today.

We may not depart from *stare decisis* without special justification. *Vitro v. Mihelcic*, 209 Ill. 2d 76, 82 (2004), citing *Chicago Bar Ass'n v. Illinois State Board of Elections*, 161 Ill. 2d at 510. Where the rule of law has been settled and does not contravene any statute or constitutional principle, it may be disregarded only for "good cause" or "compelling reasons." See *Vitro*, 209 Ill. 2d at 82. In the case at bar, plaintiffs have not provided good cause or compelling reasons to judicially abandon the "special relationship" doctrine for finding an exception to the no-affirmative-duty rule. We will continue to adhere to its principles.

---

[7]A Vermont statute (12 Vt. Stat. Ann. tit. 12, §519 (2002)) provides for a civil cause of action if a rescuer, in providing assistance, acts with gross negligence, but the statute does not recognize a civil cause of action for the failure to give reasonable assistance.

## CONCLUSION

The no-affirmative-duty rule and the "special relationship" doctrine stand as the law of this state. Accordingly, an affirmative duty to warn or protect against the criminal conduct of a third party may be imposed on one for the benefit of another only if there exists a special relationship between them. In the case at bar, no such relationship existed between the defendants and Iseberg. Nor was it shown that a principal-agent relationship existed between the parties which gave rise to a duty to warn as provided in section 471 of the Restatement (Second) of Agency. For these reasons, we affirm the judgment of the appellate court.

*Appellate court judgment affirmed.*

JUSTICE FREEMAN took no part in the consideration or decision of this case.