In the

# United States Court of Appeals
## For the Seventh Circuit

No. 07-3386

LOLA CAMP,

*Plaintiff-Appellant*,

*v.*

TNT LOGISTICS CORPORATION and
TRELLEBORG YSH, INCORPORATED,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 04 C 1358—**Joe Billy McDade**, *Judge*.

ARGUED SEPTEMBER 26, 2008—DECIDED JANUARY 14, 2009

Before RIPPLE, MANION, and SYKES, *Circuit Judges*.

MANION, *Circuit Judge.* Lola Camp brought this diversity action against TNT Logistics Corp. ("TNT") and Trelleborg YSH, Inc. ("Trelleborg"), seeking to recover damages for injuries she sustained as a result of their alleged negligence in connection with the shipment of a pallet of automobile parts. The district court

granted summary judgment for the defendants. Camp appeals. We affirm, although on partially different grounds than those relied upon by the district court.

## I. Background

During the relevant time period, Mitsubishi Motors North America, Inc. ("Mitsubishi") manufactured automobiles using an efficient and cost-effective "just-in-time" inventory system. Under this system, automotive parts from suppliers were delivered to plants "just in time" to be used on assembly lines. TNT provided logistics services to Mitsubishi, coordinating the purchase and transportation of automobile parts from suppliers as Mitsubishi's needs arose. TNT contracted with DeKeyser Express, Inc. ("DeKeyser"), a motor carrier service provider, to transport the parts. Camp worked for Transport Leasing Company ("TLC"). TLC leased Camp's services as a tractor-trailer driver to DeKeyser.

On January 21, 2003, TNT directed DeKeyser to transport some parts from several suppliers (one of which was Trelleborg) to Mitsubishi's factory in Normal, Illinois. DeKeyser dispatched Camp to make the pick-ups and delivery. The next day Camp arrived at Trelleborg's facility, which was the final stop on her route. At Trelleborg's loading dock, Camp noticed that the three pallets of parts scheduled for pick-up would fit inside the trailer only if the third pallet was stacked on top of one of the other two pallets. Camp was concerned that the load "would not ride" (i.e., that the unsecured pallet might shift due to the vacant space next to it and be

damaged). She told Trelleborg personnel of her concern and contacted DeKeyser dispatcher Ken Kasprzak and TNT transport supervisor Alan Marten to advise them of the problem. Marten contacted Dave Finck, TNT's on-site liaison at Mitsubishi's Normal, Illinois factory. After the conversation with Finck, Marten advised Camp and Kasprzak that TNT wanted the entire load delivered and directed Camp to write on the bill that TNT was aware of the situation and was releasing the shipper (Trelleborg) and the driver (Camp) from responsibility for any cargo damage. Camp then wrote the following on the bill of lading: "Shipper and Driver released of liability for any product damage as called TNT and told them didn't think would ride. Ship anyway per Dave Fink [sic]." After Trelleborg loaded the three pallets, Camp drove to TNT's cross-dock facility located across the street from the Mitsubishi plant. Before backing up to TNT's dock, Camp stopped in the parking lot and opened the right trailer door; when she did, the unsecured third pallet began to fall. When she attempted to close the trailer door to prevent the pallet from falling out, Camp injured her shoulder and arm.

Camp filed suit against TNT and Trelleborg in Illinois state court, asserting a common-law negligence claim against each defendant based upon their alleged acts and omissions in connection with the transport of the unsecured pallet. The defendants removed the action to the United States District Court for the Central District of Illinois by invoking the court's diversity jurisdiction.

The district court granted summary judgment in favor of the defendants on Camp's negligence claims. In doing

so, the court rejected Camp's claim that she could hold TNT liable under two provisions of the Federal Motor Carrier Safety Regulations ("FMCSR") and found that Camp had not presented sufficient authority in support of her "common law standpoint" argument to survive TNT's motion for summary judgment. The district court also held that Trelleborg was not liable to Camp under the FMCSR and that Trelleborg owed no duty to her in light of Illinois's open and obvious doctrine. Camp appeals.

## II. Discussion

Our review of the district court's grant of summary judgment is de novo. *Grieveson v. Anderson*, 538 F.3d 763, 767 (7th Cir. 2008). We affirm only if, after viewing all facts in the light most favorable to the non-movant (Camp) and drawing all reasonable inferences in her favor, we conclude that no genuine issue of material fact exists and that the defendants are entitled to judgments as a matter of law. *Peirick v. Indiana Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 687 (7th Cir. 2007). In addition, we may affirm on a ground other than that relied upon by the district court as long as the alternative basis has adequate support in the record. *Bombard v. Fort Wayne Newspapers*, 92 F.3d 560, 562 (7th Cir. 1996).

As a federal court sitting in diversity, we apply state substantive law and federal procedural law. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Because none of the parties raised the choice of law issue, we

apply the substantive law of Illinois, the forum state. *Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426 (7th Cir. 1991). Under Illinois law, "[t]o succeed in an action for negligence, a plaintiff must prove facts that establish the existence of a duty, a breach of the duty, and an injury to the plaintiff which was proximately caused by the breach." *Hills v. Bridgeview Little League Ass'n*, 745 N.E.2d 1166, 1178 (Ill. 2000). Whether a duty of care exists is a question of law for the court to decide, while breach and proximate cause are questions of fact for the fact-finder. *Iseberg v. Gross*, 879 N.E.2d 278, 284 (Ill. 2007).

*A. Statutory Duty*

On appeal, Camp first claims that TNT and Trelleborg are liable for negligence based on two provisions of the FMCSR, 49 C.F.R. §§ 390.13 and 392.9(a)(1), which are explained in detail below. Parts 390 and 392 (among several others) of the FMCSR are adopted by reference into the Illinois Vehicle Code by 625 ILCS 5/18b-105(b),[1] part of

---

[1] Camp never referred to this section of the Illinois Vehicle Code. However, at oral argument Camp declared that both of her claims (against each defendant) are based upon *state* law: a common-law cause of action and a statutory cause of action under the safety regulations. We are not aware of (and Camp has not pointed to) any Illinois statute that creates a cause of action for a violation of the FMCSR. However, Camp did state that a violation of the FMCSR is evidence of negligence. We construe this statement as an assertion that the defendants'

(continued...)

the Illinois Motor Carrier Safety Law. *People v. Blackorby*, 586 N.E.2d 1231, 1237 (Ill. 1992). "In a common law negligence action, a violation of a statute or ordinance designed to protect human life or property is prima facie evidence of negligence; the violation does not constitute negligence per se." *Abbasi ex rel. Abbasi v. Paraskevoulakos*, 718 N.E.2d 181, 185 (Ill. 1999). "To recover damages based upon a defendant's alleged statutory violation, a plaintiff must show that (1) she belongs to the class of persons that the statute was designed to protect; (2) her injury is of the type that the statute was designed to prevent; and (3) the violation proximately caused her injury." *First Springfield Bank & Trust v. Galman*, 720 N.E.2d 1068, 1071 (Ill. 1999). We consider the application of §§ 390.13 and 392.9(a)(1) to TNT and Trelleborg separately below.

### 1. TNT

Initially we must determine whether the relevant safety regulations apply to TNT, for if they do not TNT could not have violated them. Under 49 C.F.R. § 392.9(a)(1), "[a]

---

[1] (...continued)

alleged violation of 625 ILCS 5/18b-105(b)—which incorporates the relevant provisions of the FMCSR—is prima facie evidence of common-law negligence under Illinois law. *Kalata v. Anheuser-Busch Cos.*, 581 N.E.2d 656, 661 (Ill. 1991). Therefore, we proceed with the understanding that Camp is pursuing a common-law negligence claim against each defendant based on distinct theories of duty—statutory and traditional common-law.

driver may not operate a commercial motor vehicle and a motor carrier may not require or permit a driver to operate a commercial motor vehicle unless 1) the commercial motor vehicle's cargo is properly distributed and adequately secured as specified in §§ 393.100 through 393.136 of this subchapter." According to 49 C.F.R. § 390.5, a "motor carrier" is "*a for-hire motor carrier* or a private motor carrier."[2] (emphasis added). The same regulation defines a "for-hire motor carrier" as "a person engaged in the transportation of goods or passengers for compensation."[3] 49 C.F.R. § 390.5. A "person" includes a corporation like TNT.[4] *Id.*

Camp argues that § 392.9(a)(1) applies to TNT because TNT had a motor carrier license and was acting as a motor carrier. More particularly, Camp contends that the following facts demonstrate that TNT maintained de facto control over the cargo shipment and thus acted as a motor carrier: TNT planned the configuration of the load with its software, determined the supplier stops Camp made, and mapped the route she took; TNT employee

---

[2] While not relevant here, a "private motor carrier" is "a person who provides transportation of property or passengers, by commercial motor vehicle, and is not a for-hire motor carrier." 49 C.F.R. § 390.5.

[3] Similarly, 49 U.S.C. § 13102(14) defines "motor carrier" as "a person providing motor vehicle transportation for compensation."

[4] A person is "any individual, partnership, association, corporation, business trust, or any other organized group of individuals." 49 C.F.R. § 390.5.

Dave Finck made the decision that all three pallets had to be transported; and TNT decided that the trailer would not have the load-bar bracing equipment that helps to secure the cargo. TNT, on the other hand, maintains that its mere possession of a motor carrier license is not dispositive and asserts that it was acting as a broker[5] rather than a motor carrier. In addition, TNT argues that it did not provide motor carrier services for Mitsubishi and that DeKeyser was the motor carrier because it was contractually obligated to supply the driver, truck, and equipment.

We agree with TNT that the fact it possessed a motor carrier license is not determinative of the applicability of § 392.9(a)(1); instead, the crucial inquiry is in what capacity TNT was acting during the transaction. *See, e.g., Paul Arpin Van Lines, Inc. v. Universal Transp. Servs., Inc.*, 988 F.2d 288, 292 (1st Cir. 1993); *Schramm v. Foster,* 341 F. Supp. 2d 536, 549 (D. Md. 2004). Only if TNT was functioning as "a person engaged in the transportation of goods or passengers for compensation" does § 392.9(a)(1) apply. 49 C.F.R. § 390.5. "Transportation" is defined as

> (A) a motor vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, regardless of owner-

---

[5] A broker is "a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation." 49 U.S.C. § 13102(2).

ship or an agreement concerning use; and (B) services related to that movement, including arranging for, receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, packing, unpacking, and interchange of passengers and property.

49 U.S.C. § 13102(23). TNT did not engage in the actual movement of the automobile parts under the first prong of the transportation definition. Indeed, the contract between TNT and DeKeyser provides that DeKeyser was responsible for supplying the truck, driver, and associated equipment for the movement of the cargo, and there is no question that DeKeyser (not TNT) provided the driver and truck that moved the auto parts.

Camp argues that TNT provided "services related to th[e] movement" of the cargo under the second prong of the transportation definition. 49 U.S.C. § 13102(23). We disagree. Although TNT determined the stops Camp made and the route she took, rather than being *services* pertaining to the movement of the automobile parts these actions were merely details upon which TNT insisted to ensure that the delivery of the parts by DeKeyser would be on time. The same was also true of TNT's decision that the third pallet had to be delivered despite its instability. TNT's determination that the trailer would not have load-bar bracing equipment was also not a service germane to the movement of the cargo but was instead a condition under which the actual movement of the goods by DeKeyser was to take place. That TNT planned the configuration of the load on the

trailer with its software might, at first glance, seem to be a service by which TNT "arrang[ed] for" the movement of the cargo; however, this configuration scheme is more accurately viewed as a detail pertaining to the positioning of the cargo on DeKeyser's trailers upon which TNT insisted in order to facilitate the smooth operation of Mitsubishi's "just-in-time" system. For these reasons, TNT's actions did not rise to the level of providing services related to the movement of the parts and thus TNT was not acting as a "motor carrier." Rather, TNT was a third-party logistics company whose main focus was the timely and efficient procurement of auto parts for Mitsubishi. TNT's role was that of a "broker" who, on behalf of Mitsubishi, "negotiat[ed] for . . . transportation" by DeKeyser that would satisfy the demands of the "just-in-time" system. 49 U.S.C. § 13102(2). Therefore, 49 C.F.R. § 392.9(a)(1) does not apply to TNT and thus it owed no duty to Camp under this provision. The district court correctly granted summary judgment for TNT on this issue.

The district court also held that Camp could not hold TNT liable under § 390.13 because she would be suing TNT for aiding and abetting her own violation of the FMCSR. Under 49 C.F.R. § 390.13, "[n]o person shall aid, abet, encourage, or require a motor carrier or its employees to violate the rules of this chapter." Camp argues that TNT violated § 390.13 when it encouraged her to transport the third pallet in an unsecured state as proscribed by § 392.9(a)(1). Camp is correct that the plain language of § 390.13 applies to a "person" regardless of its function, and not just persons acting as drivers and motor carriers as with § 392.9(a). However, like the district court,

we conclude that Illinois case law precludes Camp's recovery under § 390.13.

Specifically, under Illinois law, a plaintiff cannot recover from a defendant for the defendant's aiding and abetting the plaintiff's own tortious conduct. The case of *Hudkins v. Egan*, 847 N.E.2d 145 (Ill. App. Ct. 2006), established this principle of law. In *Hudkins*, a driver lost control of a car and died in the accident. 847 N.E.2d at 147. The decedent's administratrix sued one of the decedent's friends who was riding in the car for encouraging the decedent to drive recklessly. *Id.* The Illinois Appellate Court held that the decedent as the direct tortfeasor could not have recovered as a third-party victim from the friend who encouraged her to drive dangerously (i.e., the indirect tortfeasor). *Id.* at 149-50. Camp's aiding and abetting claim is controlled by this common-law principle from *Hudkins*: Camp, as the person who operated the tractor-trailer with the unsecured pallet contrary to § 392.9(a)(1), cannot recover from TNT as a third-party victim under § 390.13 for its role in encouraging her to violate § 392.9(a)(1). Therefore, the district court properly granted TNT summary judgment on this theory as well.

2. Trelleborg

On appeal, Camp conceded that Trelleborg was acting as a shipper[6] rather than as a motor carrier and that

---

[6] A shipper is "[a] person who sends or receives property which
(continued...)

§ 392.9(a)(1) does not apply to it. However, Camp main-tains that she may hold Trelleborg liable under § 390.13 for aiding and abetting her own violations of the FMCSR. The principle from *Hudkins* which we discussed above applies equally to Trelleborg. Accordingly, Camp cannot recover from Trelleborg for its part in aiding and abetting her own violations of the FMCSR, and thus the district court properly granted Trelleborg summary judgment.

## B. *Common-law Duty*

### 1. TNT

Camp also challenges the district court's award of summary judgment for TNT based upon a traditional common-law duty approach. The court determined that Camp failed to support this "theory" with any authority and that her bare statement that "TNT is liable from a common law standpoint" was not enough to survive summary judgment. Camp accurately points out that she did in fact offer some authority (albeit at the very end of her Response and in the section in which she opposed *Trelleborg's* motion for summary judgment) in support of her position that TNT owed her a common-law duty of care and stated that TNT breached that duty. We will assume without deciding that the authority which Camp mentioned was sufficient to preserve and advance her argument that TNT owed her a common-law duty.

---

[6] (...continued)
is transported in interstate or foreign commerce." 49 C.F.R. § 376.2(k).

Camp says that TNT mistakenly scheduled the third pallet, failed to arrange for bracing equipment in the trailer when it knew there would be an unsecured pallet, failed to expedite the pallet by another truck, failed to suggest that the pallet could be broken down into smaller pieces, and failed to advise her and Trelleborg that the pallet should be double-stacked on the right side of the trailer. According to Camp, these facts indicate that TNT breached the common-law duty of care it owed her.

In Illinois, "[t]he existence of a duty depends on whether the plaintiff and the defendant stood in such a relationship to each other that the law will impose upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff." *Bajwa v. Metro. Life Ins. Co.*, 804 N.E.2d 519, 526 (Ill. 2004). "This question turns largely on public policy considerations, informed by consideration of four traditional factors: (1) the reasonable foreseeability of the injury; (2) the likelihood of the injury; (3) the magnitude of the burden of guarding against the injury; and (4) the consequences of placing that burden on the defendant." *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1125 (Ill. 2006). Whether these factors create a common-law duty is a question of law for the court. *Iseberg*, 879 N.E.2d at 284.

After considering these factors, we conclude that TNT did not owe Camp a duty of care. As evidenced by her expressions of concern to Trelleborg, DeKeyser, and TNT personnel, there is no question that Camp was aware of the risk that the third pallet might shift during the trip. Moreover, Camp testified at her deposition that she

knew that there was a possibility the unsecured pallet had shifted in transit, that it might have been leaning against the trailer doors, and that it might fall out if the trailer doors were opened. Under these circumstances, TNT could not have reasonably foreseen that Camp would open the trailer doors in a way that would cause her harm.

Camp asserts that she was under economic compulsion from TNT to encounter the danger posed by the pallet and that therefore her injuries were foreseeable.[7] She points to the following language in the Master Agreement between TNT and DeKeyser as evidence that TNT had control over her or her employment status: "When directed by [TNT], [DeKeyser] shall cause any [DeKeyser] Employee to be

---

[7] Camp argues that the deliberate encounter exception to the open and obvious doctrine (discussed *infra* n.8) applies to this case. Under this exception, harm is foreseeable to a possessor of land if he "'has reason to expect that the invitee will proceed to encounter the known or obvious danger because to a reasonable man in his position the advantages of doing so would outweigh the apparent risk.'" *LaFever v. Kemlite Co., a Div. of Dyro-Tech Indus., Inc.*, 706 N.E.2d 441, 448 (Ill. 1998) (quoting RESTATEMENT (SECOND) OF TORTS § 343A, Comment *f*, at 220 (1965)). This exception is most often applied in cases involving economic compulsion. *Sollami v. Eaton*, 772 N.E.2d 215, 224 (Ill. 2002). As we later emphasize, *infra* p. 18, we have not extended Illinois's open and obvious doctrine to this case. However, we will assume for the sake of argument that the principle inherent in the deliberate encounter exception to that doctrine is relevant to TNT's foreseeability of Camp's injuries.

removed from providing Services hereunder." Assuming that Camp qualifies as DeKeyser's "employee," all this quoted passage demonstrates is that TNT could prevent Camp from providing carrier services *to TNT*. Camp ignores the provision from the same section of the TNT/DeKeyser contract which states: "[TNT] shall have no authority to, on behalf of [DeKeyser] or otherwise, discharge, promote, suspend or otherwise discipline any [DeKeyser] employee providing services for TNT hereunder." Thus, TNT could not have taken any employment action against Camp; at most it could have directed DeKeyser not to lease Camp's services as a driver from TLC when providing future services to TNT. This part of the Master Agreement does not support Camp's assertion that she was under economic compulsion from TNT to encounter the pallet.

Camp also contends that other provisions in the TNT/DeKeyser agreement show that "additional consequences" could have arisen from her refusal to encounter the known risk. However, the sections of the agreement that she cites state that *DeKeyser* could be liable to TNT if its error led to a plant shutdown or the need for expedited transportation. Because these passages do not show that *Camp* could have been held liable to TNT, she was not economically compelled by TNT to encounter the unsecured pallet.

As additional proof of her economic compulsion (this time from DeKeyser) to encounter the risk posed by the third pallet, Camp stated that at a recent DeKeyser safety meeting she had been told that she would lose her job

if any parts were damaged due to improper loading or her negligence as a driver. We find this fact irrelevant, for in order for Camp's economic compulsion from DeKeyser to have bearing on TNT's foreseeability of Camp's injuries, TNT must have known or had reason to know of such circumstances. *See Buerkett v. Illinois Power Co.*, 893 N.E.2d 702, 710 (Ill. App. Ct. 2008) (stating that "the focus with the deliberate-encounter analysis is on what the landowner *anticipates or should anticipate* the entrant will do" (emphasis added)). Because Camp has not produced any evidence that TNT knew or should have known of the recently implemented DeKeyser policy, the deliberate encounter principle does not apply.

As it was with the foreseeability factor, Camp's knowledge is especially relevant to the likelihood of injury factor. A reasonable person in Camp's shoes would have readily appreciated and avoided the danger she knew was lurking behind the trailer doors. Therefore, from TNT's perspective there was at most a slight likelihood that Camp would be injured in light of her knowledge about the danger posed by the pallet.

The latter two factors do not counsel in favor of finding that TNT owed Camp a duty of care. Although TNT could have chosen not to ask for the pallet to be shipped or could have taken other steps to avoid Camp's injuries, Camp was in a better position to prevent her injuries because she could have opened the trailer door in a way that did not put her at risk of injury or could have sought DeKeyser's assistance and direction before doing so. In addition, Camp had been released from

liability for damage to the cargo and could have opened the door, retreated to safety, and let the chips (i.e, the auto parts) fall where they may. It would be an onerous burden for TNT to guard against injuries which result from a person's voluntary encounter with a known risk. Moreover, TNT would have to expend significant resources overseeing the actions of its motor carriers' drivers were a duty imposed in these circumstances. Accordingly, for these reasons we conclude that TNT did not owe a duty of care to Camp under Illinois common law and that summary judgment was appropriate for TNT.

2. Trelleborg

Camp next asserts that the district court's grant of summary judgment to Trelleborg on her common-law duty theory was improper. The district court held that Camp's argument that Trelleborg owed her a common-law duty foundered because the unstable pallet was an open and obvious danger.[8] We are not aware of any Illinois court

---

[8] Under Illinois law, a component of the foreseeability factor of the common-law duty analysis is the open and obvious doctrine. *Ward v. K Mart Corp.*, 554 N.E.2d 223, 232 (Ill. 1990). This doctrine provides that "persons who own, occupy, or control and maintain land are not ordinarily required to foresee and protect against injuries from potentially dangerous conditions that are open and obvious." *Bucheleres v. Chicago Park Dist.*, 665 N.E.2d 826, 832 (Ill. 1996). The Supreme Court of Illinois has also applied this doctrine to preclude a manufac-
(continued...)

that has applied the open and obvious doctrine outside of the premises or product liability arenas to a situation where, as here, a plaintiff knowingly encounters a condition located on the personal property of a third-party that was created by a defendant. It may be plausible to extend the open and obvious principle to the circumstances of this case. However, we need not decide whether the district court's *Erie*-application (*Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)) of the doctrine was appropriate because we conclude that Trelleborg did not owe a duty of care to Camp based upon the following traditional common-law duty analysis.

Camp stated that Trelleborg loaded the third pallet and made the decision to stack it on top of another pallet on the driver's side of the trailer. Camp points to testimony that "Truckloading 101" teaches that double-stacked freight with an adjacent empty space should always be placed on the passenger's side because roadways are crowned in the center and freight will invariably shift to the right. Stacking on the left is purportedly an improper trucking practice. Based on these facts, Camp argues that Trelleborg deviated from the common-law duty of care it owed her.

However, like TNT, Trelleborg could not have reasonably foreseen that Camp would choose to encounter the risk of the third pallet falling out of the truck and

---

[8] (...continued)
turer's duty to warn in the product liability context. *Sollami*, 772 N.E.2d at 219.

the injuries she received from trying to close the trailer door. Camp knew the third pallet was unsecured. Camp also knew the pallet may have shifted in transit, that it might have been leaning against the trailer doors, and that it might fall out if the trailer doors were opened.[9]

---

[9] In support of her position, Camp cites two unpublished opinions: *Holmes v. Goodyear Tire & Rubber Co.*, No. 96 C 345, 1997 WL 106104 (N.D. Ill. Feb. 12, 1997) and *Reed v. Ace Doran Hauling & Rigging Co.*, No. 95 C 4082, 1997 WL 177840 (N.D. Ill. Apr. 7, 1997). In *Holmes*, a truck driver was injured when a tire struck him as he opened the door to the trailer he had been hauling. 1997 WL 106104, at *1. The court held that Goodyear (the loader of the cargo) owed a duty to minimize harm to whomever opened the sealed load. *Id.* at *3. *Holmes* is inapposite because the plaintiff in that case picked up the trailer after it had been loaded and sealed and therefore had no knowledge that the tire posed a risk of falling when he opened the trailer doors. *Id.* at *1. Unlike the driver in *Holmes*, Camp *knew* that the unsecured pallet posed a risk of falling out when she opened the trailer door.

*Reed* is also distinguishable. In that case, the vehicle in which the plaintiff was riding was struck by a steel coil that fell off of a flatbed truck when the truck driver lost control of the truck. *Reed*, 1997 WL 177840, at *1. The district court held that the loader of the coil owed a common-law duty to the plaintiff to check the load and to ensure that it was safely secured. *Id.* at *4. In contrast to this case, the plaintiff in *Reed* was neither the driver of the truck that was improperly loaded nor did he have prior knowledge of the instability of the coil and its concomitant risk to his safety.

In addition, the likelihood of injury was quite low from Trelleborg's vantage point because a reasonable person with Camp's knowledge would have appreciated and avoided the danger posed by the pallet. The other two factors in the traditional common-law duty analysis do not militate in favor of finding Trelleborg owed Camp a duty of care. True, Trelleborg, after offering not to load the third pallet, could have refused to load it or at least could have loaded it on the right side of the trailer. (The record does not reflect whether Camp objected to loading the pallet on the left side.) However, as stated before, Camp was in a superior position to prevent her injuries. It would be a weighty burden for Trelleborg to guard against injuries to a person who was fully aware of the danger to which she exposed herself. Trelleborg's responsibilities as a shipper of cargo would be expanded greatly at considerable expense were it required to oversee the conduct of motor carrier drivers (retained by others) that transport its products. For these reasons, we conclude that Trelleborg did not owe a common-law duty to Camp and that it was entitled to a judgment as a matter of law.[10]

---

[10] Camp also argues that the district court abused its discretion when it deemed admitted certain facts listed in the defendants' motions. The court made this decision because Camp did not comply with Central District of Illinois Local Rule 7.1(d)(2)(b)(2), which instructs that claims of disputed facts must be supported by specific references to evidentiary documentation. We do not reach this issue because we have pro-

(continued...)

### III. Conclusion

Based upon the foregoing analysis, we conclude that TNT did not owe a duty to Camp under § 392.9(a)(1) because it was not acting as a motor carrier. We also hold that Illinois law does not permit Camp to hold TNT or Trelleborg liable under § 390.13 for aiding and abetting her own violation of § 392.9(a)(1). In addition, we conclude that neither TNT nor Trelleborg owed Camp a common-law duty of care. Accordingly, the district court's grant of summary judgment in favor of the defendants is AFFIRMED.

---

[10] (...continued)
ceeded in this opinion without deeming any facts admitted by Camp.

---