# Illinois Official Reports

## Supreme Court

***In re Derrico G.*, 2014 IL 114463**

| | |
|---|---|
| Caption in Supreme Court: | *In re* DERRICO G., a Minor (The People of the State of Illinois, Appellant, v. Derrico G., Appellee). |
| Docket No. | 114463 |
| Filed | August 4, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Before guilt is found in a juvenile proceeding, it is not unconstitutional for statute to allow the State's Attorney to preclude a continuance under supervision, and a circuit court erred in ruling otherwise; where a plea agreement called for probation while other charges were dropped, the court should not have unilaterally modified it *sua sponte* by entering a supervision order, and, on remand, should reconsider the agreement. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, the Hon. Terrence V. Sharkey, Judge, presiding. |
| Judgment | Circuit court judgment reversed in part and vacated in part.<br>Cause remanded with directions. |

Counsel on
Appeal

Lisa Madigan, Attorney General, of Springfield, and Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, Annette Collins and Veronica Calderon Malavia, Assistant State's Attorneys, of counsel), for the People.

Abishi C. Cunningham, Jr., Cook County Public Defender, of Chicago (James S. Jacobs, Assistant Public Defender, of counsel), for appellee.

Justices

JUSTICE KARMEIER delivered the judgment of the court, with opinion.
Chief Justice Garman and Justices Thomas, Kilbride, and Theis concurred in the judgment and opinion.
Justice Burke dissented, with opinion, joined by Justice Freeman.

**OPINION**

¶ 1 At issue in this case is the constitutionality of section 5-615 of the Juvenile Court Act of 1987 (the Act) (705 ILCS 405/5-615 (West 2010)), which, as construed by this court in *In re Veronica C.*, 239 Ill. 2d 134 (2010), grants a State's Attorney, among others, the authority to object to the entry of an order of continuance under supervision in a juvenile case before a finding of guilt. In this case, the circuit court of Cook County found section 5-615 unconstitutional, facially and as applied, reasoning that it violates separation of powers, equal protection, and due process guarantees. Pursuant to Supreme Court Rules 603 and 660(a) (Ill. S. Ct. R. 603 (eff. Feb. 6, 2013); R. 660(a) (eff. Oct. 1, 2001)), the State's appeal comes directly to this court. For the reasons that follow, we reverse in part and vacate in part the judgment of the circuit court and remand for proceedings consistent with this opinion.

¶ 2                                          PRINCIPAL STATUTE INVOLVED

¶ 3 At the time of proceedings below, section 5-615 of the Act (705 ILCS 405/5-615(1), (2) (West 2010)), provided in pertinent part:

"§ 5-615. Continuance under supervision.

(1) The court may enter an order of continuance under supervision for an offense other than first degree murder, a Class X felony or a forcible felony (a) upon an admission or stipulation by the appropriate respondent or minor respondent of the facts supporting the petition and before proceeding to adjudication, or after hearing the evidence at the trial, and (b) in the absence of objection made in open court by the minor, his or her parent, guardian, or legal custodian, the minor's attorney or the State's Attorney.

(2) If the minor, his or her parent, guardian, or legal custodian, the minor's attorney or State's Attorney objects in open court to any continuance and insists upon proceeding to findings and adjudication, the court shall so proceed."

¶ 4  An amendment to the Act, effective January 1, 2014, while still preventing the circuit court from entering an order of continuance under supervision over the State's Attorney's objection *before* a finding of delinquency, now allows the court to unilaterally order a continuance under supervision upon a finding of delinquency. See Pub. Act 98-62 (eff. Jan. 1, 2014). The statute now reads:

"Sec. 5-615. Continuance under supervision.

(1) The court may enter an order of continuance under supervision for an offense other than first degree murder, a Class X felony or a forcible felony:

(a) upon an admission or stipulation by the appropriate respondent or minor respondent of the facts supporting the petition and before the court makes a finding of delinquency, and in the absence of objection made in open court by the minor, his or her parent, guardian, or legal custodian, the minor's attorney or the State's Attorney; or

(b) upon a finding of delinquency and after considering the circumstances of the offense and the history, character, and condition of the minor, if the court is of the opinion that:

(i) the minor is not likely to commit further crimes;

(ii) the minor and the public would be best served if the minor were not to receive a criminal record; and

(iii) in the best interests of justice an order of continuance under supervision is more appropriate than a sentence otherwise permitted under this Act." (Strikethroughs and underscores omitted.) Pub. Act 98-62 (eff. Jan. 1, 2014) (amending 705 ILCS 405/5-615 (West 2012)).

¶ 5                                BACKGROUND

¶ 6  On January 26, 2012, the attorneys in this case, assistant State's Attorney Jennifer Bruzan, and assistant Public Defender Geraldine Nolfi, appeared before the judge in this cause on a different charge lodged against the respondent-minor—possession of a controlled substance—that predated the unrelated conduct which underlies the felony charge to which respondent ultimately pled guilty herein. The respondent did not appear. At that time, the State proffered the following evidence in support of a request for a juvenile arrest warrant.

¶ 7  On January 5, 2012, Officers Connor and McCarthy were on patrol when, at 2700 West Flournoy Street in Chicago, Illinois, they observed respondent shouting, "rocks, rocks"—a street term for crack cocaine—and passing foot traffic in an attempt to solicit the sale of narcotics. The respondent was placed in custody, and a custodial search of his person revealed one clear, plastic bag containing five mini-Ziploc bags ultimately determined to contain crack cocaine.

¶ 8  Based on that proffer, the judge found "probable cause" for issuance of a juvenile arrest warrant, and "urgent and immediate necessity"—presumably for detention of the respondent. The court nonetheless decided to "enter and continue" a juvenile arrest warrant, and instructed Ms. Nolfi to contact respondent's mother to advise her of the need to be present, with the

respondent, at the next scheduled court date. The court and the assistant State's Attorney also discussed the possibility of a drug treatment program that would result in deferred prosecution upon successful completion. At that juncture, the State appeared to be receptive to the idea of deferred prosecution under appropriate circumstances.

¶ 9    On February 10, 2012, the respondent appeared before the judge on new charges: two counts of aggravated battery and three counts of resisting a peace officer. Respondent's counsel stipulated to probable cause, and the court again found "urgent and immediate necessity." The court denied the State's request for electronic monitoring, imposed a curfew, and sent the respondent home with his older brother, who apparently had "some history" with the judge as well. As was the case on January 26, respondent's mother did not attend because of an ongoing health issue, represented to be congestive heart failure. When questioned in court, respondent indicated he did not know who his father was.

¶ 10    Respondent did not appear at the next scheduled court date; nor did his mother.

¶ 11    Neither respondent nor his mother timely appeared at the next court date, April 5, 2012, and a juvenile arrest warrant was issued. Thereafter, that same day, respondent and his mother did appear. Counsel for the respondent then announced that the minor would plead guilty in the aggravated battery case, and there would be a recommended sentence. The State confirmed that there was a plea agreement, the principal terms of which included a plea of guilty to one count of aggravated battery on a public way, the *nolle prosequi* of another aggravated battery count and the striking, on leave to reinstate, of multiple resisting charges involving three police officers, as well as the *nolle prosequi* of the prior, unrelated felony charge of possession of a controlled substance, and a "recommended" sentence of 18 months' probation. The State indicated before the two arrests for the aggravated battery and possession charges the respondent "had one prior arrest on November 1, 2009, for aggravated battery with a weapon, not a firearm *** but it looks like nothing came of that."

¶ 12    The court then advised the respondent of the nature of the charge to which he would plead and the possible punishment. In the latter regard, the court suggested that supervision was possible. The following exchange then took place:

"MS. BRUZAN [Assistant State's Attorney]: For a Class 3 felony, [Y]our Honor?

THE COURT: Yes.

MS. BRUZAN: No.

THE COURT: Yes. Or it could be all the way up to five years in jail.

MS. BRUZAN: You're correct in that he could receive supervision but only if it was by agreement of all the parties.

THE COURT: Oh, well, the supreme court has yet to answer that question."

¶ 13    The court then digressed into a monologue concerning the status of other cases in which it had held the consent provision of section 5-615 unconstitutional, concluding, in the course of that discussion: "So right now in this courtroom in these four walls, if I want to give supervision, you can take me up on appeal and tell the supremes or ask the supremes to make a ruling." The court then resumed its admonishments, indicating that it had "correct[ed] the State's Attorney here" with respect to the court's authority to grant supervision. The court thereafter advised the respondent of his trial rights and ascertained that his guilty plea was voluntary. The judge then directed the State to provide a factual basis.

- 4 -

¶ 14    The State indicated that Officer Lindahl would testify that on the date pertinent to the charge, at approximately 9:55 p.m., he and other officers were dispatched to a disturbance on the street where they encountered "a large number of people," among them, the respondent and his brother. Officer Lindahl would testify, while he was assisting in the arrest of the respondent's brother, the respondent lowered his shoulder and charged into Officer Lindahl, attempting to knock him to the ground and, in doing so, hit Officer Lindahl about the body. Officer Lindahl would further testify that, while attempting then to arrest the respondent for aggravated battery, the respondent began swinging his hands and arms and failed to follow verbal direction to put his hands behind his back. He stiffened his arms and pulled away, refusing to be handcuffed. It took a number of officers to properly handcuff him.

¶ 15    The respondent stipulated to those facts and persisted in his plea of guilty.

¶ 16    The court accepted the plea of guilty, but indicated it would not enter judgment on the plea at that time. The court again referenced another case in which it had held the consent provision of the statute unconstitutional and had placed a minor on supervision over the objection of the State. The court suggested, in accord with its ruling there: "[T]hat's my thinking, but we'll see where we're going. And I haven't made a decision yet. I'm just putting everybody on notice." The court then continued the matter for preparation of a social investigation report, "sentencing," and status on the possession case, the latter because the State declined, pending "sentencing," to immediately nol-pros that offense. Before concluding proceedings, the court addressed the respondent's counsel regarding the "possibility of supervision," and the following colloquy ensued:

"THE COURT: Ms. Nolfi [Assistant Public Defender], this may be a case—I'm considering the possibility of supervision.

MS. NOLFI: Judge, I was actually trying to negotiate that because the mother tells me that if there's a—if there's a probation as a tenant—if there's someone, a minor living in her—going to subsidize housing on probation, that she would be evicted.

MS. BRUZAN: Your Honor, if we're going to bring that information in, then I would also bring in there's other people in the household, including the mother herself, who are currently on probation.

THE COURT: Well—

MS. BRUZAN: I mean I'm not—If we're going to be bringing in people—

THE COURT: No, I'm not considering doing anything other than to tell him—and I'm not doing sentencing now. I'm just telling him. I'm contemplating—

MS. NOLFI: Right."

¶ 17    The court then took care to clarify its role, or lack thereof, in orchestrating circumstances that might ultimately result in a continuance under supervision:

"THE COURT: Ms. Nolfi, let me make sure the record is clear, you did not know and I have not discussed with you the fact that I'm contemplating supervision on this case.

MS. NOLFI: No.

THE COURT: You, in good faith, tried to the best of your ability to make it a supervision case.

MS. NOLFI: I did.

- 5 -

>THE COURT: And in your negotiations with the State, the lowest they would be willing to go is probation.
>
>MS. NOLFI: Yes.
>
>THE COURT: And that's fine. And I will leave it at that."

The court then admonished the respondent and his mother that the respondent should behave himself in the interim to the next hearing so that the court might order supervision at that time. The court's admonishments were interrupted only by the court's chastisement of the respondent for yawning, open-mouthed, while the court spoke, and the court's digression into yet another discussion of the cases in which the court had ruled the consent provision unconstitutional. In the course of that discussion, the judge emphasized his singularity in the state's judiciary, the amount of time this court was taking to render a decision in one of the cases in which he found the pertinent statute unconstitutional, *i.e.*, In re Danielle J., No. 10 JD 336 (Cir. Ct. Cook Co.), and how the respondent's actions might affect the posture of this case prospectively:

>"THE COURT: Right now, in any other courtroom in the state of Illinois, by my thinking, in juvenile court, the judge has to get permission from the State's Attorney in order to give supervision.
>
>I believe I'm an exception and maybe the only one that right now has found the law unconstitutional, separate and distinctly from *In Re: Tyrees C.*, is by the way, *In Re: Danielle J.,* cited the Supreme Court Number 110810. It's not the same number, though.
>
>That case is up in the supreme court now waiting [*sic*] a resolution. It's been up there since July of 2010. So I'm waiting to get some guidance. But for right now, I found that law unconstitutional. So I'm out there a lone bird out there all by myself and it gets lonely on that limb that I'm on, but I don't want [the respondent] to break it off unnecessarily."

¶ 18    At the next hearing, on May 1, 2012—what the court described as a "sentencing" hearing—the State emphasized at the outset that the recommendation of 18 months' probation, a component of the parties' negotiated plea agreement, had been the recommendation of "the State *and* the Public Defender." (Emphasis added.) Ms. Bruzan briefly stated the principal reason for the State's insistence upon a disposition of probation, that being the fact that the respondent "did pick up two felony cases within a short period of time." She noted that "[t]he State could have elected to proceed on both of those," which she characterized as "provable cases." Ms. Bruzan also stated: "I just want to make sure it's on the record that the State would be objecting to any supervision for the Minor."

¶ 19    Counsel for respondent did not contradict the State's representation that the joint recommendation of 18 months' probation in the parties' plea agreement had been a component of the agreement. Ms. Nolfi in fact conceded: "The Minor did agree to eighteen months of felony probation on the last court date." She did, however, suggest that the respondent was a candidate for supervision. She concluded: "[I]n the spirit of the Juvenile Court Act, there's *no objection* if you want to sentence the Minor to supervision." (Emphasis added.)

¶ 20    The court acknowledged the filing of the social investigation report, and indicated it would be "made a part of the file and used for purposes of sentencing." The court noted that the probation officer had therein agreed with the recommendation of 18 months' probation, and

the court asked if he would also agree with "felony supervision," to which the probation officer replied affirmatively. Thereafter, the court made no reference to the report or information contained therein, focusing instead on constitutional issues.

¶ 21 The court first addressed whether it was "obligated" "to go along with probation" or whether it "could impose an order of supervision." The court mentioned various opinions rendered by this court, including this court's decision in *In re T.W.*, 101 Ill. 2d 438 (1984), wherein this court upheld the consent provision of the statute against the contention that it violated separation of powers. The court found this court's decision in *In re T.W.* was not controlling for various reasons, and noted that opinion did not, in any event, consider an equal protection challenge to the statute. Although the court made contradictory statements with respect to whether the court had or had not made a finding of guilt in this case, the court ultimately distinguished this court's decision in *People ex rel. Devine v. Stralka*, 226 Ill. 2d 445 (2007), *inter alia*, on the ground that the circuit court was there vacating a finding of delinquency already entered. In the course of the court's discussion, the court stated:

> "This Court has been asked to consider supervision after a finding. Actually, I've not been asked. I'm considering it myself after the finding of guilt but before the adjudication and sentencing. And by the way, I've not entered judgment on the plea. And what that means to me is the Judge Stralka decision is not binding on this Court on this case, and I need not follow it. Stralka's ruling remains good law. I need to emphasize that. I'm not talking about a motion to vacate the finding of delinquency entered and continued. In addition, the ruling on Judge Stralka's case in the Supreme Court never considered the arguments of equal protection in reaching its decision."

¶ 22 The court then demanded of the "first chair" of the assistant State's Attorneys present: "I would like to know which one of the attorneys actually made the decision to make this a probation matter as versus a supervision matter." Assistant State's Attorney Karr responded that it was the policy of the State's Attorney's office not to agree to supervision on any felony case, and noted, in this instance, the respondent had two felony cases set for trial on the date of the guilty plea.

¶ 23 The court then commenced extensive questioning of the three assistant State's Attorneys present, asking them how many years they had been out of law school, how many years they had been with the State's Attorney's office, what training they had had pertinent to dispositional matters, and who was involved in the case review process. In the course of the court's inquiry, the court observed: "I've been in law enforcement for 41 years." "I've been a judge in Juvenile Court longer—twice as long as Sarah's—Ms. Karr has been in the Cook County State's Attorney's Office." At one point, the court mentioned what appears to have been the only conceivable basis for its eventual finding that the consent provision, as applied in this case, violated equal protection guarantees: "[T]his is a felony, the Minor would be eligible for supervision if he were in the adult system." After the court found the consent provision unconstitutional as violative of "separation of power," "equal protection," and "due process arbitrarily enforced," the court resumed questioning the assistant State's Attorneys along the lines previously suggested, and eventually invited them to "make a record of what [their] discussion was" in this case. The following colloquy ensued:

"MR. KELLEY [Assistant State's Attorney]: Well, Judge, that's a policy question, and as far as what we go in to making our office and the basis of that, we're not going to put that on the record.

THE COURT: Okay.

MR. KELLEY: Respectfully.

THE COURT: Oh, respectfully understood. But understand I am still finding the law to be unconstitutional based on the reasons that I've already said.

MR. KELLEY: Okay."

¶ 24     Having found the consent provision unconstitutional, the court disregarded the State's objection to supervision, stating it would "sentence the Minor to a period of eighteen months of supervision" with various attendant conditions.

¶ 25     On May 15, 2012, the cause again came before the court for a hearing on the State's motion to reconsider. In that motion, the State challenged the court's ruling that the consent provision of section 5-615 is unconstitutional, and asked the court "to vacate its order granting a continuance under supervision, and in its stead, enter a finding of guilt, adjudicate Minor-Respondent a ward of the court, and sentence him to 18 months of felony probation, *the agreed upon recommendation by the Minor-Respondent and the People at the admission and plea of guilty*." (Emphasis added.) At the outset, the court acknowledged the lengthy citation and discussion of case law in the motion, and ascertained that the State intended to "stand on what's written," and the respondent's counsel would "stand on the argument *** made previously."[1]

¶ 26     The court then began questioning of assistant State's Attorney David Kelley, attempting to elicit information regarding the internal review, evaluation, and charging policies of the Cook County State's Attorney's Office, focusing on the facts of this particular case: "[H]ave you ever approved a felony charge of aggravated battery in the Felony Division where it involved this type of incident where it was a bump, a shoulder bump to a police officer?" Mr. Kelley responded: "Judge, I'm sure I have. I can't remember the specifics, but yes. I approved many charges dealing with contact with the police that resulted in an aggravated battery." In a clear attempt to impugn the State's charging decision, and the viability of the charge to which the respondent pled after all others had been nullified pursuant to the parties' plea agreement, the judge then brought his prior, personal experience as a police officer to bear upon disposition of the case, opining that he had suffered various injuries as a police officer and "[n]one of those were approved by Felony Assistant State's Attorneys in Cook County." The court continued: "In my 12-plus years as a Chicago Police Officer, I cannot remember one case being approved by the Assistant State's Attorney of Cook County's Office of a felony involving contact of [an] insulting or provoking nature."

¶ 27     Mr. Kelley advised the court: "I prosecuted personally cases where officers were spit on and charged with aggravated battery as far as being the victim."

---

[1] The record does not indicate that respondent's counsel ever made an "argument"—oral or written—that the consent provision of the statute was unconstitutional. The circuit judge raised the matter *sua sponte* and then ruled the statute unconstitutional without any discernible input from respondent's counsel.

¶ 28    The judge again related his personal experience as a police officer: "Well, unfortunately, I also was spat on, or spit on, and none of my cases went to *** 26th & California. I don't know. I think that's distinguishable from a bumping—spitting on is quite provoking, and I would distinguish that from this case." The judge then, while attempting to elevate "spitting" above "bumping" in the hierarchy of "insulting" or "provoking" conduct, acknowledged that he had found that the consent provision violated principles of equal protection while under the misapprehension that an adult defendant could receive supervision in a felony case under the Criminal Code:

> "I'll be honest with you. In looking at—I've learned something. And you've helped me learn, Mr. Kelley, being here in a number of years and a number of times in court with the law, and I really thought in felony adult court that the judges could give a supervision on felony cases also without approval. Clearly, that is not the case.
>
> And so I appreciate Ms. Bruzan bringing it to my attention. But my argument as to this particular case is one that I think still stands and that based on my 40-plus years in law enforcement, twelve on Chicago, twelve in the county, and fifteen years—does that add up to 42? Close to 40? It's over 40. As long as it's over 40. Me not ever having come in contact with a felony aggravated battery for incidental—not incidental.
>
> This was not incidental. This was direct contact, intentional direct contact of an insulting or provoking nature. I don't ever remember a call—a case like that.
>
> Now, spitting, I am absolutely distinguishing, and I don't know—had this been a spitting case, Ms. Nolfi, I don't know that I would have given him because just the nature of that. I think it's so insulting that I am not sure that I would have agreed to the supervision in this case."

¶ 29    The court went on to yet again question whether the conduct supporting the offense to which the respondent pled should have been charged as a felony. In the course of that discussion, the court did not mention the controlled substance charge or the resisting charges that were, respectively, nol-prossed, and stricken on leave to reinstate, as part of the parties' plea agreement.

¶ 30    Thereafter, the court, at length, discussed cases cited by the State in its motion to reconsider, among them this court's decisions in *In re T.W.* and *Stralka*. With respect thereto, the court appeared to acknowledge, and then disregard, the impediment that *stare decisis* posed to its ruling:

> "THE COURT: Stare decisis. That a Court has to follow the rulings that a previous Appellate or Supreme Court—a supervisory Court, has already ruled on. But I tell you three judges [referencing those specially concurring in *Stralka*] have opened invitation to trial judges across the State of Illinois to review this matter."

¶ 31    The judge observed that the "better way" to fix what he had long believed to be a problematic statute was to go through the legislature, a course he had pursued during his tenure as a judge:

> "I've waited three years and have done numerous efforts in trying to contact the Legislative Branch—what little contacts I have in the Legislative Branch, to see if something couldn't be effected. Part of the problem I ran into was former individuals who had been in the State's Attorney's Office that were in the legislature or individuals that I know professionally, half of them appearing to be soft on crime. And taking the

- 9 -

State's Attorneys out of the system, out of the program, might make them look weak on crime, and they were cautious in proceeding on that. And that's something I won't share—the names of the individuals that I talked to, but that seemed to be consistent."

¶ 32 The judge admitted, given his failure to effect the change he desired through his contacts in the legislative branch, he was "aggressively" looking for test cases in his judicial capacity:

"Now, after three years, I finally started to aggressively look for cases that I believe were, for a lack of a better term, supervision worthy. And in my mind, this case, with [the respondent], is one of those cases."

¶ 33 In what could be aptly described as a running summary, the court acknowledged its erroneous belief, at the time of its original ruling, that a criminal defendant charged with a felony in criminal court could receive supervision. Nonetheless, the court cited "remaining reasons" for its ruling, among them that the judge had not, in his "42 years" seen "aggravated battery to a police officer involving insulting or provoking nature" prosecuted, and Mr. Kelley had not provided "any information" to justify this action to the court. The judge reiterated that he had been injured when he was a police officer and the cases "all wound up on the misdemeanor call." The court again voiced as a consideration in its ruling the fact that the State had not provided, and declined to provide, any guidelines to evince the standards governing charging and settlement determinations:

"THE COURT: But you wouldn't discuss on the record the reasoning behind that process?

MR. KELLEY: Judge, respectfully, we will not go into our policy regarding charging."

In the end, after further inquiry along these lines, the court denied the State's motion to reconsider.

¶ 34 The State appealed to this court from the circuit court's ruling that the consent provision is unconstitutional, and the court's order of supervision, which was necessarily predicated upon that ruling. The State asks this court to: "(1) reverse the trial court's judgment declaring Section 5-615(1)(b) unconstitutional, (2) vacate the order of a continuance under supervision and (3) remand the case to the trial court for further proceedings in conformance with 705 ILCS 405/5-705 & 710 (2012) and the negotiated plea agreement between the parties."

¶ 35                                                                        ANALYSIS
¶ 36                                                            Post-briefing Motions
¶ 37 As a preliminary matter, we address the parties' postbriefing motions, which were taken with the case: the respondent's motion to withdraw portions of his argument and strike portions of the State's reply brief and appendix; the State's response and motion to supplement.

¶ 38 In his brief before this court, the respondent suggested that this case is moot (1) "in light of amendments to the juvenile supervision statute *** which removes the State's ability to veto a trial court's decision to impose supervision," and (2) the expiration of the respondent's original term of supervision. In its reply brief, the State responded that the case is not moot insofar as (1) "the amendments to Section 5-615 did not eliminate the State's Attorney's 'approval provision' in the *pre-finding stage*," and (2) respondent's original term of supervision has not

- 10 -

expired insofar as proceedings on petitions for violation of supervision have, by agreement, tolled the period of supervision during the pendency of this appeal, "thereby defeating respondent's claim that this appeal is moot due to the expiration of his 'original term' of supervision." (Emphasis in original.) With respect to the former argument, the State additionally asserts: "Although the 2014 amended version contains no 'approval provision' once a finding of guilt has been entered, a trial court is required to make certain specified findings in order to continue a case under supervision in a post-finding stage." In support of its second contention, the State has appended to its reply brief, in Appendices A and B respectively, copies of two petitions for supplemental relief that were filed in the circuit court: one alleging that the respondent violated the terms of his supervision by failing to attend school as required and by failing to complete court-ordered community service; the other alleging the commission of additional criminal offenses, specifically, resisting a peace officer, battery and criminal trespass. Also in Appendix B, the State includes a copy of a separate petition for adjudication of wardship based upon those same offenses.

¶ 39     Respondent's motion to strike concedes the misrepresentation in his brief concerning the minor's status, and makes clear: "Appellee has no objection to the State properly supplementing the record on appeal with records indicating that Derrico is still on supervision." Given respondent's acknowledged error, he requests that the pertinent portion of his brief "be withdrawn and *** not be considered." He specifies, however, that he "does not concede the remaining mootness argument based on the change in the statute itself and this argument is not withdrawn."

¶ 40     In its response to the respondent's motion, the State submits that some documents appended to its reply brief are relevant to rebut the respondent's assertion that his supervision has terminated, while others are pertinent to any argument that this case is moot because the minor would ultimately receive supervision *after* a finding of guilt pursuant to the provisions added by amendment to section 5-615.

¶ 41     We observe that the allegation in the State's reply brief, concerning an agreement to continue the violation proceedings until the resolution of this appeal, is uncontradicted by the respondent in his motion to strike. There appears to be no disagreement that documents evincing the basis for tolling of the current period of supervision are relevant for that purpose and thus, to that extent, are properly before this court. We consider them for that limited purpose. Beyond that, the allegations therein are just that—unproven allegations.

¶ 42     We next consider respondent's contention that his mother's criminal records are irrelevant, were improperly appended to the State's reply brief in Appendix C, and should be stricken. The avowed basis for appending the mother's criminal records to the State's reply brief is the assertion that the respondent, in his brief, implied that the assistant State's Attorney, in proceedings below, misrepresented the probationary status of the respondent's mother. The State's assertion occurred on April 5, 2012, when the assistant State's Attorney—in response to the respondent's claim (originating with his mother) that probation for the respondent might result in the family's eviction—stated that the respondent's mother was herself "currently" on probation. In his brief, in an apparent attempt to show that the assistant State's Attorney had misrepresented the mother's probationary status, counsel for respondent states: "The Social Investigation ultimately prepared by the probation department established that the Mother had '*previously*' been on probation and did not indicate that either she, or any member of the

- 11 -

household, was *currently* on probation." (Emphases in original.) The respondent also argues that the State's misrepresentation "illustrates the heightened adversarial role of the State" and "places context around the trial court's decision to allow for supervision for Derrico—to both give the first time adjudicated minor a second chance and not to displace nine people from their home."

¶ 43    The criminal records of the respondent's mother, which the State has appended to its reply brief in Appendix C, indicate that her probation had just been terminated on March 20, 2012, days before the assistant State's Attorney made the statement regarding her probationary status. It does not appear that any misrepresentation was intentional. In fact, without the criminal record the State has appended to its brief, respondent cannot even show that there was an inaccuracy. That is so because the social investigation report—indicating that the mother was "previously" on probation—postdated the assistant State's Attorney's statement that the mother was "currently" on probation. Therefore, the mother could have been on probation when the assistant State's Attorney's statement was made and "previously" on probation by the time the social investigation report was filed.

¶ 44    In any event, the mother's probationary status is only relevant because of the specter of eviction raised by the respondent in the circuit court—eviction which had apparently not taken place while the mother was on probation. We note that the respondent's mother was reported to have stated, when interviewed by the probation officer for the social investigation report, that she had resided in "one place" for 30 years. The social investigation also recites: "According to background information the mother was previously on probation for Possession of a Controlled Substance." No one in the circuit court took issue with any of the information in the report.

¶ 45    The circuit court did not mention any of this—or anything else from the social investigation report for that matter—in rendering its ruling. More to the point, because it is what the *State* may have considered, overlooked or ignored when it objected to supervision that is relevant, the mother's precise probationary status as of the April 5 proceeding is not, in our opinion, of determinative significance, since the assistant State's Attorney's remark indicates that she was obviously aware of the mother's recent probationary status, and the fact that she had not been evicted as a result thereof. To the extent that respondent has made this an issue, we will consider that part of the mother's appended criminal record that indicates the mother's probationary status had just terminated on March 20, 2012, days before the assistant State's Attorney made the statement in question. The remaining portions of her criminal records will not be considered.

¶ 46    The State's motion to supplement the records at issue will be granted only within the limited parameters of the foregoing discussion.

¶ 47                                                    Mootness

¶ 48    What remains of respondent's mootness argument is the contention that the recent amendment of section 5-615 renders the consent provision irrelevant because the circuit court can now, ultimately, enter an order for continuance under supervision with or without the State's consent. The State notes that "the amendment to Section 5-615 did not eliminate the State's Attorney's 'approval provision' in the pre-finding stage," and, in any event, the State suggests that the respondent in this case would not be granted supervision pursuant to the

- 12 -

postfinding provisions of the amended statute because of the required findings therein, including, *inter alia*, that "the minor is not likely to commit further crimes." (Underscore omitted.) Pub. Act 98-62 (eff. Jan. 1, 2014) (amending 705 ILCS 405/5-615(1)(b)(i) (West 2012)).

¶ 49 In this respect, we reiterate that the allegations of the recent petitions filed by the State are only allegations. So far as we know—unlike the respondent's drug case—there has not even been evidence adduced which would result in a finding of probable cause. However, we reject the argument that the amendment renders this appeal moot.

¶ 50 First, the legislature has seen fit to retain the pre-finding consent provision in the amended statute, such that the State's Attorney will still have the right to object to the entry of an order of supervision prior to a finding of delinquency. In this respect, as noted hereafter in our discussion, the legislature, in other articles of the Juvenile Court Act, has accorded the State's Attorney similar authority, thus underscoring the importance the legislature has placed upon the State's Attorney's ability to veto supervision and insist upon findings. See 705 ILCS 405/2-20(1), (2) (West 2012) (applicable to proceedings involving abused, neglected or dependent minors); 705 ILCS 405/3-21(1), (2) (West 2012) (pertaining to minors in need of authoritative intervention). The legislature obviously did not see the consent provision as superfluous, or a finding of delinquency as inconsequential in this regard, otherwise the legislature would not have retained the consent provision. Retention of the provision in the amended version of the statute thus militates against a finding that the issue before us is moot.

¶ 51 Moreover, after a finding of delinquency, the court would have to consider the respondent's circumstances and make the requisite statutory findings before it could enter an order continuing the case under supervision, all of which is speculative under these circumstances. Specific findings are not mentioned in section 5-615(1)(a) of the statute as amended, which will, in many cases involve negotiated dispositions. In this case, there is also the matter of accounting for the charges that were either nol-prossed or stricken on leave to reinstate pursuant to the parties' plea agreement, which the circuit court cannot simply disregard.

¶ 52 For these reasons, we conclude that this appeal is not moot.

¶ 53 Constitutionality—General Principles

¶ 54 We begin our constitutional analysis with general principles. As this court has observed, all statutes are presumed constitutional and the party challenging a statute's validity bears the burden of demonstrating a clear constitutional violation. *In re Lakisha M.*, 227 Ill. 2d 259, 263 (2008). A court must construe a statute so as to affirm its constitutionality, if reasonably possible. *Lakisha M.*, 227 Ill. 2d at 263. Our review of a statute's constitutionality is *de novo*. *Lakisha M.*, 227 Ill. 2d at 263.

¶ 55 With respect to controlling precedent, this court observed in *Iseberg v. Gross*, 227 Ill. 2d 78, 94-95 (2007) (quoting *Chicago Bar Ass'n v. Illinois State Board of Elections*, 161 Ill. 2d 502, 510 (1994)):

> " 'The doctrine of *stare decisis* is the means by which courts ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion. *Stare decisis* permits society to presume that fundamental principles are established in the law rather than in the proclivities of individuals. The doctrine thereby contributes to

the integrity of our constitutional system of government both in appearance and in fact. *Stare decisis* is not an inexorable command. However, a court will detour from the straight path of *stare decisis* only for articulable reasons, and only when the court must bring its decisions into agreement with experience and newly ascertained facts.' "

"We may not depart from *stare decisis* without special justification." *Iseberg*, 227 Ill. 2d at 101.

¶ 56    The trial court in this case found that the statutory authority given to the State's Attorney under section 5-615, to object to the prefinding granting of a continuance under supervision, violates separation of powers, equal protection, and due process guarantees, and that the statute is unconstitutional "both on its face and as to this specific case."

¶ 57    In order to successfully mount a facial challenge to a statute, the challenger must establish that no set of circumstances exists under which the statute would be valid. *United States v. Salerno*, 481 U.S. 739, 745 (1987). "Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973). In other words, if a statute is constitutionally applied as to the challenger, his facial challenge necessarily fails.

¶ 58                                    "Due Process Arbitrarily Enforced"

¶ 59    With these principles in mind, we first address the circuit court's finding that the consent provision of sections 5-615(1) and 5-615(2) (705 ILCS 405/5-615(1), (2) (West 2012) (now amended by Pub. Act 98-62 (eff. Jan. 1, 2014))) is unconstitutional insofar as the court believed it was arbitrarily enforced in this case. In an attempt to support the court's "argument" that the statute is unconstitutional, and discredit the State's decision to object to a continuance under supervision prior to a finding of guilt, the circuit court repeatedly pressed the presiding assistant State's Attorneys to disclose their training, years of experience as practicing attorneys—which the judge compared, unfavorably, with his own 40-plus years of law enforcement experience—and the guidelines they followed in reaching their decision. The court apparently gave little or no consideration to the fact that multiple charges against the respondent had fallen away as part of what appears to have been a fully negotiated plea agreement; nor did the court address to any significant degree matters relevant to the State's decision, such as the circumstances of the offense, the respondent's prior conduct, or his family situation.

¶ 60    Prior to enumerating the myriad facts and factors that justify the State's decision, we note, in passing, that the circuit court's extensive questioning of the assistant State's Attorneys about matters not related to the facts of this case was inappropriate. Even the judge, at one point, recognized that *he* might be violating "separation of powers" by his intrusive questioning.

¶ 61    In *People v. Stewart*, 121 Ill. 2d 93, 109 (1988), this court addressed the contention that Illinois's death penalty statute was unconstitutional because it led to "arbitrary and capricious application of the death penalty insofar as it allegedly delegate[d] to prosecutors, without sufficient guidelines, the discretion to determine in which cases the death penalty [would] be sought." In *Stewart*, this court rejected that contention, and in so doing, quoted extensively, and approvingly, from the Supreme Court's opinion in *McCleskey v. Kemp*, 481 U.S. 279

(1987), wherein the Supreme Court recognized the propriety of allowing prosecutors to exercise discretion in seeking the death penalty. See *Stewart*, 121 Ill. 2d at 111. Among the statements adopted by this court were the following: " '[T]he policy considerations behind a prosecutor's traditionally "wide discretion" suggest the impropriety of our requiring prosecutors to defend their decisions to seek death penalties ***.' '[T]he capacity of prosecutorial discretion, to provide individualized justice is "firmly entrenched in American law." ' " *Stewart*, 121 Ill. 2d at 111 (quoting *McCleskey*, 481 U.S. at 296, 311-12).

¶ 62    In *Stewart*, this court referenced its earlier decision in *People ex rel. Carey v. Cousins*, 77 Ill. 2d 531 (1979), where this court had previously addressed, and rejected, arguments that section 9-1(d) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, ¶ 9-1(d)) violated due process guarantees and the separation of powers provision of the Illinois Constitution. With respect to the former contention, this court rejected the "claim that the power of the State's Attorney to determine whether or not a sentencing hearing shall be held is left to his 'unbridled discretion,' and that section 9-1(d) thus violates due process," observing that "the State's Attorney has always enjoyed a wide discretion in both the initiation and the management of criminal litigation." *Cousins*, 77 Ill. 2d at 539. Accord *People v. Williams*, 147 Ill. 2d 173, 265 (1991).

¶ 63    Collectively, these cases stand for the proposition that courts may not require prosecutors to defend their decisions to seek death penalties—the ultimate punishment. If that be the case—and the cited authorities so hold—how can we say that the State can be required by a court to justify its discretionary decision to object to *supervision* in a juvenile case prior to a finding of guilt? We cannot.

¶ 64    Of course, the assistant State's Attorneys could have easily justified their decision had they chosen to do so. The facts of the two cases in which respondent was charged would alone have sufficed. The State in fact more than once pointed out that the respondent had picked up two felony charges in a short time. Beyond that, however, the facts—proven sufficiently to support the issuance of a warrant in one case (the drug case) and to support a guilty plea in the other—establish that the respondent was in need of a more serious deterrent than mere supervision would provide.

¶ 65    The evidence proffered in the drug case indicated that respondent was attempting to sell crack cocaine on the street. We note that the State only charged him with possession, though there appears to be no reason why it could not have charged possession with intent to deliver. Further, we again point out that the State, at that juncture, did not seem opposed to the idea of deferred prosecution under appropriate circumstances.

¶ 66    Then, in less than a month, having already been taken into custody for attempting to sell crack cocaine, and with a felony drug charge pending against him, respondent committed the offense to which he ultimately pled guilty. In that regard, the respondent stipulated to the following facts. On the date pertinent to the charge, Officer Lindahl and other officers were dispatched to a disturbance on the street where they encountered "a large number of people," among them, the respondent and his brother. While Officer Lindahl was assisting in the arrest of the respondent's brother, the respondent lowered his shoulder and charged into Officer Lindahl, attempting to knock him to the ground and in doing so, hit Officer Lindahl about the body. Then, while the officers were attempting to arrest the respondent for aggravated battery, the respondent began swinging his hands and arms and failed to follow verbal direction to put

his hands behind his back. He stiffened his arms and pulled away, refusing to be handcuffed. It took a number of officers to properly handcuff him.

¶ 67    We reiterate: this took place at a time when respondent already had a felony drug charge pending against him, a circumstance that did not deter him from engaging in a physical altercation with the officers. While the circuit court repeatedly belittled the significance of this conduct, and engaged in nuanced attempts to distinguish it from what the court considered the more serious act of "spitting"—an act, in the court's view, that would *not* have warranted supervision—we see the respondent's conduct in a different light. It seems to us that the officers were in a potentially volatile situation. They were on the street, at night, attempting to make an arrest, amidst a large group of people. A physical altercation involving an additional person at the scene could only have heightened the danger they faced. The fact that no officer suffered significant injury does not diminish the potential for injury caused by the respondent's conduct.

¶ 68    On these facts alone, without considering anything else, we find that the State's pre-finding objection to supervision was not arbitrarily exercised in this case. However, there is more.

¶ 69    It is clear that this was a negotiated guilty plea. Consideration was shown the respondent in the form of the State's abandonment of what were characterized as "provable" charges. In return, the respondent pled guilty to a single charge, with a "recommended" disposition of 18 months' probation. The State twice advised the court that the disposition represented the recommendation of both "the State and the Public Defender." Ms. Nolfi, on behalf of the respondent, in fact conceded: "The Minor did agree to eighteen months of felony probation." Adding the considerations shown in the negotiated plea to the factual milieu only strengthens our finding that the State acted reasonably when it insisted upon a disposition of probation. However, there is still more.

¶ 70    Clearly, when the State negotiated the plea agreement and the parties presented it to the court, attorneys for the State were aware of at least some of the facts which were shortly thereafter reported in the social investigation report. Obviously, Ms. Bruzan knew that the respondent's mother was or recently had been on probation. She was also aware that his brother had "some history" with the judge, and that his brother had been arrested as part of the very incident that resulted in the charge to which the respondent pled guilty.

¶ 71    The social investigation report discloses information on, and attitudes of, family members that suggest a lenient approach in dealing with the respondent was not in his best interest or that of the public. In the social investigation report, respondent's mother was reported to have stated that she suffered from congestive heart failure and diabetes—a fact of which the parties and court were advised when the mother was repeatedly absent during early proceedings in this case. Thus, because of health problems, her ability to supervise the respondent was most likely limited. Moreover, the respondent's mother was seemingly less than candid when she was interviewed by the probation officer, a troubling circumstance which calls into question her ability and/or willingness to address the respondent's problems going forward. For example, the respondent's mother stated that no one in the family "has been treated for drug or alcohol abuse or mental illness." "She also stated that no one [in the family] has been arrested, on probation or incarcerated." However, "[a]ccording to background information [obtained by the probation officer] the mother was previously on probation for Possession of a Controlled Substance." Of course, we have already referenced the arrests of her sons. According to the

- 16 -

probation officer, the "mother stated that they have lived in the one place for the past 30 years. She described the neighborhood as being okay and possibly having a medium concentration of gang and drug involvement." "The mother stated that DCFS has never been involved" with her family. However, the next sentence of the social investigation report states: "According to background information DCFS was involved in the past." The mother's comments evince either an inability or unwillingness to face facts. That does not bode well with respect to her supervision of the respondent or her cooperation in his rehabilitation.

¶ 72    Then there is the respondent's failure to acknowledge the seriousness of his situation or the personal issues with which he must deal. Aside from his commission of back-to-back offenses, a vignette of the former—failure to appreciate the seriousness of his situation—can be seen in the disinterest shown by the respondent when he yawned in the face of the judge, who was in the process of intimating to the respondent and his counsel—before the judge even saw the social investigation report—the judge's inclination to put the respondent on supervision. Evidence of the respondent's failure to recognize his personal problems can be seen in his statement to the probation officer that he handles frustration well, and his inconsistent admission elsewhere "that he has punch[ed] holes in the walls in the past when he gets upset."

¶ 73    Taking all this into account, it is quite frankly inconceivable that anyone could find that the State's exercise of its discretion in this case was arbitrary, resulting in a due process violation. Any finding to the contrary minimizes the seriousness of respondent's conduct, completely ignores the consideration shown by the State's decision to nol-pros some charges and strike others with leave to reinstate, and is, in sum, inconsistent with an impartial assessment of the circumstances. One of the enumerated purposes of the Juvenile Court Act is to "hold each juvenile offender directly accountable for his or her acts." 705 ILCS 405/5-101(1)(b) (West 2012). The respondent obviously has not appreciated the seriousness of his conduct. In this respect, the disposition of probation—to which the *parties* agreed—addressed that concern. The disposition substituted by the court—in apparent pursuit of an objective broader than the interests of this minor or the public—did not. A continuance under supervision was clearly not in this respondent's interest or that of the public.


¶ 74                              Separation of Powers

¶ 75    The separation of powers clause of the Illinois Constitution provides: "The legislative, executive and judicial branches are separate. No branch shall exercise powers properly belonging to another." Ill. Const. 1970, art. II, § 1. As we observed in *People v. Hammond*, 2011 IL 110044, ¶ 51, our constitution does not attempt to define legislative, executive and judicial power, as it is neither practicable nor possible to enumerate the myriad powers of government and to declare that a given power belongs exclusively to one branch for all time. In both theory and practice, the purpose of the provision is to ensure that the whole power of two or more branches of government shall not reside in the same hands. *Hammond*, 2011 IL 110044, ¶ 51; *People v. Walker*, 119 Ill. 2d 465, 473 (1988).

¶ 76    The separation of powers provision was not designed to achieve a complete divorce among the three branches of our system of government; nor does it prescribe a division of governmental powers into rigid, mutually exclusive compartments. *Hammond*, 2011 IL 110044, ¶ 52. " 'By necessity, the branches of government do not operate in isolation, and between them there are some shared or overlapping powers.' " *Hammond*, 2011 IL 110044,

- 17 -

¶ 52 (quoting *People v. Felella*, 131 Ill. 2d 525, 538 (1989)). Inevitably, there will be areas in which the separate spheres of government overlap, and in which certain functions are shared. *County of Kane v. Carlson*, 116 Ill. 2d 186, 208 (1987). Put simply, the three branches of government are " 'parts of a single operating government, and *** the separation of powers clause was not designed to achieve a complete divorce between them.' " *County of Kane*, 116 Ill. 2d at 208 (quoting *People v. Reiner*, 6 Ill. 2d 337, 342 (1955)). The determination of when, and under what circumstances, a violation of the separation of powers doctrine has occurred remains with the judiciary. *Hammond*, 2011 IL 110044, ¶ 52; *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 411 (1997).

¶ 77     To begin our discussion of this issue, we return to this court's decision in *Cousins*. As noted in the previous section of this opinion, this court in *Cousins* addressed and rejected both due process and separation of powers arguments. In the latter respect, the defendant's argument focused on the fact that no death sentence could be imposed without a sentencing proceeding, and no sentencing proceeding could take place unless it was requested by the prosecutor. If the prosecutor failed to request a sentencing hearing, he or she thus precluded the imposition of a death sentence, and in that sense, it was argued, the prosecutor participated in the sentencing process and thus usurped a judicial function. In rejecting that position, this court cited three cases—*People v. Bombacino*, 51 Ill. 2d 17 (1972); *People v. Handley*, 51 Ill. 2d 229 (1972); *People v. Sprinkle*, 56 Ill. 2d 257 (1974)—as "embod[ying] a view of the separation of powers provision of the Constitution opposed to that urged here." *Cousins*, 77 Ill. 2d at 536.

¶ 78     *Bombacino* involved a provision of the Juvenile Court Act (Ill. Rev. Stat. 1967, ch. 37, ¶ 702-7(3)) that authorized the State's Attorney to transfer a delinquency proceeding involving a juvenile to a criminal court and thus permit prosecution of the juvenile as an adult under the provisions of the Criminal Code. Defendant argued that due process required the juvenile court judge to hold a hearing on the removal petition. This court rejected that contention. The *Cousins* court noted, "[w]hile the constitutional provision immediately involved in *Bombacino* was due process rather than separation of powers, the decision necessarily presupposes that the determination made by the prosecutor is not to be regarded as a judicial act." *Cousins*, 77 Ill. 2d at 537.

¶ 79     *Handley* also involved the removal of a juvenile from juvenile court for trial in criminal court, in that case on a charge of murder. Among other arguments was the contention that "vesting discretion in the State's Attorney to decide whether or not to remove a juvenile from the jurisdiction of the juvenile court *without providing any standards to limit his discretion* deprives juvenile defendants of due process and equal protection under the law." (Emphasis added.) *Handley*, 51 Ill. 2d at 232. This court rejected that contention, stating: "Historically, the office of the State's Attorney has involved the exercise of a large measure of discretion in the many areas in which State's Attorneys must act in the performance of their duties in the administration of justice. We do not find it constitutionally objectionable that the legislature has seen fit to grant discretion to the State's Attorney in removal matters under the Juvenile Court Act, particularly in view of the fact that the purposes of the Act *** can be presumed to be considered by State's Attorneys in making determinations in these matters." *Handley*, 51 Ill. 2d at 233.

¶ 80     *Sprinkle* was cited in *Cousins* as expressing a similar view. This court acknowledged that the legislature had subsequently amended the statute to reduce the degree of prosecutorial

discretion in removal cases; however, this court found "[t]hat development does not, of course, disturb the conclusion reached in *Sprinkle* and its precursors with respect to the separation of powers issue." *Cousins*, 77 Ill. 2d at 539.

¶ 81 Thus, in *Cousins* and the cases cited therein this court found that a statute which allowed the prosecutor to decide when a juvenile would be subjected to prosecution as an adult, and the substantial penalties attendant thereto, did not violate the separation of powers provision of our constitution. Those cases sanctioned, as constitutional, statutory provisions that gave prosecutors significant discretionary power to dictate the range of penalties to which a juvenile would be subjected. Here, in contrast, barring an agreement of the parties as to the suitability of a continuance under supervision, section 5-615, prior to amendment, merely allowed the prosecutor to object to *supervision.* Moreover, as amended, the statute merely delays the point in the proceedings at which the court may, under appropriate circumstances, order a continuance under supervision. The procedural juncture to which the court's authority to decide is now delayed is the point at which the court normally gets to decide sentencing matters—after a finding of guilt. The authority that the prosecutor retains under the statute, as amended, pales by comparison to the authority that was granted to prosecutors by the legislature, and approved as constitutional by this court, in *Cousins* and cases discussed therein.

¶ 82 We note that the separation of powers finding in *Cousins* was justified, as well, by this court's opinion in *People v. Phillips*, 66 Ill. 2d 412, 415-16 (1977), a case addressed by the parties herein on account of its inclusion in this court's analysis in *In re T.W.*, a decision that rejected the very separation of powers argument respondent now raises. As the *Cousins* court observed, in *Phillips*, this court "sustained a provision of the Dangerous Drug Abuse Act [citation] which required the consent of a defendant's probation officer before the defendant could be allowed to avoid a pending criminal proceeding charging the unlawful possession of a controlled substance." *Cousins*, 77 Ill. 2d at 539.

¶ 83 In *Hammond*, a unanimous decision, this court discussed the principle that the legislature may "define[ ] and restrict[ ] the circumstances in which a State's Attorney may exercise his prosecutorial authority," and cited *Phillips*, and the statute at issue therein, as an "example of the application of this principle—theoretically circumscribing the authority of *both* the circuit court and the State's Attorney." (Emphasis in original.) *Hammond*, 2011 IL 110044, ¶ 57. In *Hammond*, this court addressed its prior decision in *Phillips*:

"Acknowledging that the power to impose sentence is exclusively a function of the judiciary (*Phillips*, 66 Ill. 2d at 415), this court noted that the situation at hand concerned a defendant who had been charged with, but not convicted of, a crime. Since defendant had not been *convicted* of a crime at the pertinent time for election of treatment, *sentencing* was not then at issue. Therefore, 'the authority granted to the probation officer to deny treatment under the Act to persons charged with, but not convicted of, a criminal offense does not infringe upon the court's constitutional right to impose sentence.' " (Emphases in original.) *Hammond*, 2011 IL 110044, ¶ 60 (quoting *Phillips*, 66 Ill. 2d at 415-16).

¶ 84 This court in *Phillips*, and again in *Hammond*, recognized that "conviction"—in those discussions understood to mean a finding of guilt—marked a traditional procedural boundary beyond which the judiciary was then authorized to exercise *its* authority to sentence. This court

has acknowledged that certain diversionary dispositions authorized by the legislature, such as the drug treatment in *Phillips*, and supervision prior to a finding of guilt in a delinquency proceeding (see *In re T.W.*, 101 Ill. 2d at 441-42), fall on the other side of that boundary, representing prefinding dispositions in which the legislature may properly—and constitutionally—determine that the executive branch should retain substantial control. See *In re T.W.*, 101 Ill. 2d at 441-42 ("In both instances, the legislation gives the executive branch the power to cause the proceedings to go forward within the traditional confines of the juvenile or criminal justice systems."); see also *City of Urbana v. Andrew N.B.*, 211 Ill. 2d 456, 473-74, 498-99 (2004) (where the analyses of the majority and the dissent coalesced, if nowhere else, upon the abstract principle that juvenile supervision under section 5-615 of the Act then extant—and necessarily section 5-615(1)(a) of the current version, which retains consensual juvenile supervision as it then existed—may be entered, without a finding of guilt, only upon the agreement of the State and the respondent).

¶ 85    Based upon the foregoing authorities and analysis, including the controlling precedent represented by *In re T.W.*, we hold that the consent provision of section 5-615 does not violate the separation of powers clause of our constitution.

¶ 86                                Equal Protection

¶ 87    We now turn to the circuit court's finding that the consent provision of section 5-615 violates equal protection guarantees.

¶ 88    In conducting an equal protection analysis, this court applies the same standards under the United States Constitution and the Illinois Constitution. *Wauconda Fire Protection District v. Stonewall Orchards, LLP*, 214 Ill. 2d 417, 434 (2005). The equal protection clause guarantees that similarly situated individuals will be treated in a similar fashion, unless the government can demonstrate an appropriate reason to treat them differently. *People v. Whitfield*, 228 Ill. 2d 502, 512 (2007). The equal protection clause does not forbid the legislature from drawing proper distinctions in legislation among different categories of people, but it does prohibit the government from doing so on the basis of criteria wholly unrelated to the legislation's purpose. *Wauconda Fire Protection District*, 214 Ill. 2d at 434. Where fundamental rights are not at issue, this court applies a rational basis scrutiny and considers whether the challenged classification bears a rational relationship to a legitimate governmental purpose. *Whitfield*, 228 Ill. 2d at 512.

¶ 89    Although the circuit court found that the consent provision of section 5-615 violated equal protection guarantees facially and as applied, the court provided no rational for the former and, with respect to the latter, stated only: "[T]his is a felony, the Minor would be eligible for supervision if he were in the adult system." By the time of the hearing on the State's motion to reconsider, the court recognized its error, but stated the error would not affect the court's "argument in this particular case." The court offered no substitute reasoning to support the court's "argument."

¶ 90    In support of the court's ruling, the respondent argues that "the State veto power allowed in the juvenile supervision statute but not allowed in the adult supervision statute violates the equal protection rights of juveniles." That, the respondent contends, is because the "adult supervision counterpart found in 730 ILCS 5/5-6-1(c)(d) (West 2010), in contrast to the juvenile supervision statute, does not require the assent of the State's Attorney nor does the

adult statute allow the State to veto the decision of the trial court to enter the disposition." Counsel for respondent dismisses the State's observation that respondent is not similarly situated to an adult because an adult charged with a felony would not be eligible for supervision as "miss[ing] the broader point that under the adult system, there is no State veto power at all and [the respondent] was eligible for supervision under 5-615." He continues: "[I]t is not what he was charged which made [*sic*] him ineligible for supervision but rather the State veto power in 5-615."

¶ 91    Respondent cannot simply ignore the facts of this case. He cannot disregard the considerations he obtained in negotiations with the State, and he cannot otherwise, figuratively, compare apples and oranges by picking and choosing the characteristics that suit his purposes while ignoring the rest. Respondent cannot, as a threshold matter, establish that he is similarly situated in all relevant respects to those with whom he would make comparison.

¶ 92    As the Supreme Court has noted, equal protection "does not forbid all classifications" (*Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)), "[i]t simply keeps governmental decisionmakers from treating differently persons *who are in all relevant respects alike.*" (Emphasis added.) *Id*. Evidence of different treatment of unlike groups does not support an equal protection claim. *Fournier v. Sebelius*, 718 F.3d 1110, 1124 (9th Cir. 2013).

¶ 93    Respondent would have us compare the provisions of the supervision statute in the Juvenile Court Act with the supervision provisions applicable to adults in the Unified Code of Corrections, ignoring the individual, or group, characteristics of those subject to the respective provisions, and the purposes of the comprehensive enactments in which they are included. We note, in the latter respect, if individual and group characteristics and circumstances do not matter, if uniformity were the only goal and the requisite to satisfy guarantees of equal protection, then all juvenile offenders could be rendered subject to the provisions of the Unified Code of Corrections, and equal protection would be satisfied. The legislature has not deemed that in the interests of juvenile offenders or society; nor do we.

¶ 94    First and foremost, respondent cannot establish that he is similarly situated to an adult who could take advantage of the provisions of the supervision statute in the Unified Code of Corrections because respondent was charged with and pled guilty to a felony, and no similarly situated adult is eligible for supervision under that statute. Subsection (c) of section 5-6-1 of the Code provides that a court may not "enter an order for supervision of the defendant" if the defendant is "charged with" "a felony." 730 ILCS 5/5-6-1(c) (West 2010). While respondent is correct in his observation that the supervision statute in the Unified Code of Corrections does not give the State the right to object to the court's entry of an order of supervision, in order to make the case for an equal protection violation, he has to be able to show he is similarly situated "in all relevant respects" to those who could take advantage of the disposition provisions of that statute. He cannot.

¶ 95    For an individual like the respondent, the dispositional alternatives available under the Juvenile Court Act are actually more favorable than those extended to a similarly situated person under the Unified Code of Corrections, in that the pertinent supervision provisions of the Juvenile Court Act at least offer the possibility of supervision, with the consent of all parties concerned, prior to a finding of guilt, and, with the recent amendments, the court can now order supervision after a finding of guilt, in appropriate circumstances, without the consent of the State's Attorney.

¶ 96    Because respondent was charged with a felony, the circuit court and the respondent cannot establish the threshold requirement for an equal protection violation. However, he fails to cross the threshold for another reason.

¶ 97    Respondent entered into a fully negotiated guilty plea. As part of that plea, significant consideration was afforded the respondent in return for his plea of guilty, consideration in the form, *inter alia*, of the State's agreement not to pursue multiple other charges originally lodged against him. Respondent voluntarily negotiated himself into that more favorable position, and was apparently prepared to accept the "recommended" disposition of probation as part of that comprehensive agreement, before the court unilaterally changed that term, without giving any consideration whatsoever to the rest of the parties' bargain, and substituted a disposition that, under the circumstances, was not allowed by statute. Having received the benefit of his agreement with the State, and having passively allowed the court to give him more than he bargained for, without giving up anything in the process, respondent now asks this court to confirm the result of the circuit court's advocacy on his behalf, claiming that, had he been relegated to probation, as agreed, he would have been disadvantaged when compared to some undefined individual who might, hypothetically, take advantage of the provisions of the adult supervision statute. Not surprisingly, our research has not disclosed any similar scenario, where a respondent-minor, or defendant, who entered into a fully negotiated guilty plea, involving concessions by the State, and an agreed sentence, then repudiated the sentence, while retaining the concessions, and claimed that the sentence, which was inextricably tied to the concessions, constituted, or would have constituted, an equal protection violation. This kind of bootstrapping appears to be unprecedented.

¶ 98    We *have* found authority that, for purposes of equal protection analysis, differentiates those who enter into a negotiated plea agreement from others who enter a blind guilty plea. See *People ex rel. Madigan v. Kinzer*, 232 Ill. 2d 179, 186-87 (2009); *People v. Eckhardt*, 127 Ill. 2d 146, 151-52 (1989). In *Kinzer,* this court noted that the State's offer of consideration for pleading guilty distinguishes a plea agreement from a blind guilty plea, the former often entailing the dismissal of other charges and the recommendation of a specific sentence. *Kinzer*, 232 Ill. 2d at 186; *Eckhardt*, 127 Ill. 2d at 151-52. In *Kinzer*, this court found that those who enter in negotiated guilty pleas are "not similarly situated" to those who enter blind guilty pleas. *Kinzer*, 232 Ill. 2d at 187.

¶ 99    Respondent's position ignores basic principles of fairness governing the enforcement of plea agreements. In *People v. Evans*, 174 Ill. 2d 320, 327 (1996), though the procedural context was different, this court pointed out the inequity where the State, pursuant to a negotiated plea agreement, had dismissed other charges and recommended a specific sentence, only to have defendants later seek modification of the sentences to which they had earlier agreed "while holding the State to its part of the bargain." As an appellate panel has since observed, "this flies in the face of contract law and constitutional concerns of fundamental fairness." *People v. Jones*, 329 Ill. App. 3d 470, 473 (2002) (citing *Evans*, 174 Ill. 2d at 327). More recently, this court has reiterated that the enforceability of plea agreements is not a one-sided affair as "the other half of the contractual equation is the benefit of the bargain accruing to the State." *People v. Donelson*, 2013 IL 113603, ¶ 19.

¶ 100   Considering these authorities, it seems to us that respondent cannot, for purposes of equal protection analysis, liken his situation to that of an individual who pleads guilty,

unencumbered by agreements relating to his disposition, and who then stands before a court seeking the application of the supervision provisions of the Unified Code of Corrections. A person in the *respondent*'s position would be someone who has obtained significant concessions from the State in negotiations and who then repudiates the sentence of probation, to which he agreed, while asking the court to give him supervision instead. In this additional respect, the circuit court's equal protection argument, and that of the respondent, fails at the threshold level.

¶ 101   Moreover, respondent's attempt to compare his circumstance, and the applicability of the Juvenile Court Act, to persons facing sentencing under the provisions of the Unified Code of Corrections fails on another level. Because minors in delinquency proceedings are generally "not subject to the severe deprivation of liberty of an adult sentence" they are not similarly situated to adult offenders. *In re Jonathon C.B.*, 2011 IL 107750, ¶¶ 118, 120. Indeed, though this court in *In re Rodney H.*, 223 Ill. 2d 510, 518 (2006), recognized that the legislature, in 1999, had "retooled" article V of the Juvenile Court Act, we were quick to add:

> "Even as the legislature recognized that the juvenile court system should protect the public, it tempered that goal with the goal of developing delinquent minors into productive adults, and gave the trial court options designed to reach both goals. Article V may represent 'a fundamental shift from the singular goal of rehabilitation to include the overriding concerns of protecting the public and holding juvenile offenders accountable for violations of the law,' but proceedings under the Act still are not criminal in nature. See *In re A.G.*, 195 Ill. 2d 313, 317 (2001). 'Delinquency proceedings are *** protective in nature and the purpose of the Act is to correct and rehabilitate, not to punish.' *In re W.C.*, 167 Ill. 2d 307, 320 (1995); see also *In re Beasley*, 66 Ill. 2d 385, 390 (1977), citing *McKeiver v. Pennsylvania*, 403 U.S. 528, 541, 29 L. Ed. 2d 647, 658, 91 S. Ct. 1976, 1984 (1971); *In re Armour*, 59 Ill. 2d 102, 104 (1974) ('The first purpose of [a juvenile court] statute is not to punish but to correct'). Indeed, 'no suggestion or taint of criminality attaches to any finding of delinquency by a juvenile court.' *In re Dow*, 75 Ill. App. 3d 1002, 1006 (1979), citing *People ex rel. Hanrahan v. Felt*, 48 Ill. 2d 171, 174-75 (1971); accord *People v. Brazee*, 333 Ill. App. 3d 43, 48 (2002)." *Rodney H.*, 223 Ill. 2d at 520.

We have a Juvenile Court Act, separate and apart from the provisions of the Criminal Code and the Unified Code of Corrections, because the legislature has recognized that juveniles are not similarly situated to adults.

¶ 102   In *People v. Taylor*, 221 Ill. 2d 157, 167 (2006), this court recognized that differences remain, even after the 1999 changes to article V of the Juvenile Court Act:

> "The policy that seeks to hold juveniles accountable for their actions and to protect the public does not negate the concept that rehabilitation remains a more important consideration in the juvenile justice system than in the criminal justice system and that there are still significant differences between the two, indicating that 'the ideal of separate treatment of children is still worth pursuing.' " *Taylor*, 221 Ill. 2d at 170 (quoting in part from *McKeiver v. Pennsylvania*, 403 U.S. 528, 546 n.6 (1971) (plurality op.)).

¶ 103   Juvenile proceedings are fundamentally different from criminal proceedings (*McKeiver*, 403 U.S. at 541-51; *Taylor*, 221 Ill. 2d at 171), a difference which extends to the role of the

State. We conclude our discussion with observations on that role—observations that have a bearing upon all of the constitutional issues raised herein, and address the suggestion by the respondent that what he describes as "the heightened adversarial role that the State plays in juvenile court" should disqualify the State's Attorney from exercising a pre-finding veto of a continuance under supervision.

¶ 104 As this court made clear in *Rodney H.*, a petition for adjudication of wardship is not a direct action by the State to inflict punishment. *Rodney H.*, 223 Ill. 2d at 520-21. We assume, as this court did in *Handley*, that State's Attorneys, in making determinations in these matters, consider the purposes and objectives of the Juvenile Court Act (*Handley*, 51 Ill. 2d at 233), which are " 'protective in nature *** to correct and rehabilitate, not to punish' " (*Rodney H.*, 223 Ill. 2d at 520 (quoting *In re W.C.*, 167 Ill. 2d 307, 320 (1995))). This court has recognized that the State, "as *parens patriae*" (*People v. R.G.*, 131 Ill. 2d 328, 344 (1989)) has a compelling interest in protecting the welfare of children, including "the lives of delinquent minors." *In re Presley*, 47 Ill. 2d 50, 56 (1970). The legislature's determination that the State should play that role in this and other contexts of the Juvenile Court Act, and in fact exercise the very authority here in question, can be seen in identical statutory provisions in other articles of the Act.

¶ 105 Like section 5-615, article II of the Act, applicable to proceedings involving abused, neglected or dependent minors (705 ILCS 405/2-20(1), (2) (West 2012)), and article III of the Act, pertaining to minors in need of authoritative intervention (705 ILCS 405/3-21(1), (2) (West 2012)), provide that a circuit court may enter an order of continuance under supervision before proceeding to a finding *unless* a State's Attorney, or one of the other parties listed in the statutes, objects, in which case the court "shall *** proceed" to "findings and adjudication."

¶ 106 These provisions, both of which are contained in articles pertaining to the welfare of children, list the State's Attorney among those who would undoubtedly be concerned with the children's best interests. Those statutes mirror the consent provisions found in section 5-615 of the Act. Significantly, like section 5-615, they also demonstrate a legislative recognition that findings have consequences, and that the State, among other interested parties, should have the right to insist that juvenile proceedings, of whatever nature, proceed to that point.

¶ 107 As this court has noted, it is the State's Attorney's duty to see that justice is done not only to the public at large, but to the accused as well. *People v. Williams*, 147 Ill. 2d 173, 256 (1991). Having carefully considered the facts and circumstances of this case, we find that the State exercised its authority under section 5-615 in accordance with that duty.

¶ 108 For the reasons stated, we find the consent provision of section 5-615 constitutional. The circuit court erred in finding otherwise and in continuing the matter under supervision pursuant to that finding. In that respect, we reverse the circuit court's judgment declaring section 5-615(1)(b) unconstitutional and vacate its order of a continuance under supervision. Consistent with our foregoing analysis, this matter will be returned to the circuit court in the pre-finding, procedural posture it occupied when the circuit court unilaterally modified the parties' plea agreement, struck down the statute, and entered an order continuing the case under supervision. The status of the negotiated plea agreement presented by the parties for the court's consideration—which necessarily entails the question of whether all of the original charges may be resurrected if said agreement is rejected—will be the initial matter before the circuit court.

¶ 109    Circuit court reversed in part and vacated in part. Cause remanded with directions.

¶ 110    JUSTICE BURKE, dissenting:

¶ 111    I disagree with the majority's conclusion that section 5-615(1)(b) of the Juvenile Court Act (705 ILCS 405/5-615(1)(b) (West 2010)), does not violate the separation of powers provision of the Illinois Constitution (Ill. Const. 1970, art. II, § 1), when applied to the facts of this case. I therefore dissent.

¶ 112                                                     I

¶ 113    The circuit court in the case at bar was presented with a negotiated plea agreement between the minor respondent and the State in which the respondent agreed to plead guilty to a charge of aggravated battery on a public way in exchange for a recommended sentence of 18 months' probation. See 705 ILCS 405/5-605(2)(a) (West 2010) (authorizing guilty pleas for minors). When presented with the plea agreement, the court informed the parties that it was considering rejecting the State's recommended sentence of probation and ordering supervision, as set forth under section 5-615 of the Juvenile Court Act (705 ILCS 405/5-615 (West 2010)). At the time of the proceedings in the circuit court, section 5-615 provided, in relevant part:

"§ 5-615. Continuance under supervision.

(1) The court may enter an order of continuance under supervision for an offense other than first degree murder, a Class X felony or a forcible felony (a) upon an admission or stipulation by the appropriate respondent or minor respondent of the facts supporting the petition and before proceeding to adjudication, or after hearing the evidence at the trial, and (b) in the absence of objection made in open court by the minor, his or her parent, guardian, or legal custodian, the minor's attorney or the State's Attorney.

(2) If the minor, his or her parent, guardian, or legal custodian, the minor's attorney or State's Attorney objects in open court to any continuance and insists upon proceeding to findings and adjudication, the court shall so proceed." 705 ILCS 405/5-615 (West 2010).

¶ 114    After the circuit court broached the subject of supervision, the State noted that, under section 5-615(1)(b), its approval was necessary before the court could enter an order of supervision. The State indicated that it objected to supervision and would stand by its recommendation of probation.

¶ 115    Thereafter, the circuit court conducted a plea hearing. The court admonished the respondent that, by pleading guilty, he could receive anywhere between supervision and a maximum of five years in jail. The court also admonished the respondent that it was not bound by the sentencing recommendation made by the State. In addition, the circuit court advised the respondent that, by pleading guilty, he was waiving certain constitutional rights, including the right to a trial at which the State would be required to prove him guilty beyond a reasonable doubt. The parties also stipulated to a factual basis which established that the respondent, while on a public street, hit a police officer with his shoulder, attempting to knock him to the ground.

¶ 116　　At the conclusion of the plea hearing, the court found that the respondent had been advised of and understood his rights, that the plea was voluntary, and that the factual basis to which the respondent had stipulated was sufficient to sustain a conviction for the offense of aggravated battery on a public way. The court stated that it accepted the minor's plea. The circuit court subsequently noted that, although it had accepted the respondent's guilty plea, it was withholding entering judgment adjudicating the respondent a ward of the court. The court then continued the case for the preparation of a social investigation report and further proceedings.

¶ 117　　At a subsequent hearing, the court held the State's Attorney consent provision in section 5-615(1)(b) unconstitutional and entered an order of supervision over the objection of the State. There were three grounds for the circuit court's ruling regarding section 5-615(1)(b). First, the circuit court concluded that the State's Attorney consent provision violated the separation of powers provision of the Illinois Constitution. The court concluded that it is "improper for the General Assembly to give veto power to the State's Attorney, who is in the Executive Branch, because sentencing is an inherent power of the Judiciary, not the Executive Branch, and to me, that is a clear violation of the separation of power doctrine." Second, the circuit court concluded that section 5-615(1)(b) violated principles of equal protection because it did not permit a "[j]uvenile judge to grant a sentence of supervision" without the consent of the State's Attorney while adult defendants who qualified for supervision could receive the disposition even in the absence of the State's Attorney's consent. And, third, because section 5-615(1)(b) did not contain any guidelines for the State's Attorney to apply in determining when supervision should be allowed, the court concluded that the statute violated principles of due process.

¶ 118　　Having found the State's Attorney consent provision unconstitutional, the circuit court stated that it was "sentenc[ing] the [respondent] to a period of eighteen months of supervision." The order of supervision entered by the circuit court required the respondent, among other things, to attend counseling sessions as directed by his probation officer, to maintain a C average in school, and to have no contact with gangs, guns, or drugs. The court also ordered the respondent to submit a swab for DNA indexing (see 730 ILCS 5/5-4-3 (West 2010)). The court reiterated that it had not entered judgment adjudicating the respondent a ward of the court because "it's a supervision case."

¶ 119　　The circuit court subsequently denied a motion to reconsider filed by the State. The State then appealed the circuit court's finding of unconstitutionality directly to this court. Ill. S. Ct. R. 603 (eff. Feb. 6, 2013); R. 660(a) (eff. Oct. 1, 2001).

¶ 120　　　　　　　　　　　　　　　　　　II

¶ 121　　The majority reverses the judgment of the circuit court, holding, in part, that the State's Attorney consent provision of section 5-615(1)(b) does not violate the separation of powers provision when applied to the facts of this case. I disagree.

¶ 122　　The circuit court accepted the respondent's plea of guilty to the charge of aggravated battery on a public way. *Supra* ¶ 16. A guilty plea waives all nonjurisdictional errors or irregularities and important constitutional rights, including the right to a trial at which the State will be held to its burden of proving guilt beyond a reasonable doubt. *People v. Peeples*, 155 Ill. 2d 422, 494 (1993). " 'When a plea of guilty is fairly and understandingly made, it admits every material fact alleged in the indictment and all the elements of the crime with which an

accused is legally charged, and obviates the need of any proof whatsoever.' " *Id.* (quoting *People v. Wilfong*, 19 Ill. 2d 406, 409 (1960)). As this court has stated, a plea of guilty is " 'more than a confession which admits that the accused did various acts; it is itself a conviction; nothing remains but to give judgment' " and determine punishment. *People v. Manning*, 227 Ill. 2d 403, 419 (2008) (quoting *Boykin v. Alabama*, 395 U.S. 238, 242 (1969)); *Machibroda v. United States*, 368 U.S. 487, 493 (1962) (" 'A plea of guilty differs in purpose and effect from a mere admission or an extra-judicial confession; it is itself a conviction. Like a verdict of a jury it is conclusive.' " (quoting *Kercheval v. United States*, 274 U.S. 220, 223 (1927))). By accepting the respondent's plea of guilty, the circuit court in this case necessarily found that the respondent was guilty of aggravated battery on a public way; that is what it means for a court to accept a guilty plea.

¶ 123　　It is true that the circuit court did not enter a finding of guilt in the record. However, the court's omission is of no moment. "A finding of guilt is unnecessary where there is a plea of guilty. *** 'Upon a plea of guilty or actual confession in open court, the court has nothing to do but fix the amount of punishment and render judgment or sentence accordingly. There is nothing for the court to find. The prisoner, by his confession, has made a finding unnecessary.' " *Witte v. Dowd*, 102 N.E.2d 630, 635 (Ind. 1951) (quoting *Griffith v. State*, 36 Ind. 406, 408 (1871)). Even in the absence of an express finding of guilt, the circuit court's acceptance of the respondent's guilty plea established, as a matter of law, that the respondent was guilty of committing the offense of aggravated battery on a public way. *People v. Domico*, 15 Ill. 2d 590, 593 (1959) ("[i]t is unnecessary that the court enter a finding of guilt" when the defendant has pleaded guilty); *People v. Dodge*, 411 Ill. 549, 550 (1952); *People v. Bute*, 396 Ill. 588, 591 (1947); *People v. Werner*, 364 Ill. 594, 599 (1936); *People v. Andrae*, 295 Ill. 445, 454 (1920).

¶ 124　　After accepting respondent's plea of guilty, the circuit court entered an order of supervision under section 5-615, evidently assuming that the "admission" or "stipulation" required by the statute was the equivalent of, or included, guilty pleas.[2] The majority does not question this assumption by the circuit court or find that section 5-615 is inapplicable in cases where the circuit court has accepted a minor's guilty plea. Indeed, it is a necessary part of the majority's analysis that supervision under section 5-615 is available following the acceptance of a guilty plea; if it were not, there would be no need for the majority to reach the constitutionality of the State's Attorney consent provision. If, however, section 5-615 permits the circuit court to enter an order of supervision when the court accepts a minor's guilty plea and thereby finds the minor guilty, then the State's Attorney consent provision is unconstitutional.

¶ 125　　As the majority acknowledges, a circuit court's finding of guilt marks "a traditional procedural boundary" (*supra* ¶ 84), beyond which the State's Attorney's constitutionally permissible role comes to an end. Once the circuit court in this case accepted the respondent's plea of guilty, that fact established the respondent's guilt and the State's Attorney was constitutionally prohibited from vetoing the circuit court's subsequent decision to order supervision for the respondent. Accordingly, when applied to the facts of this case, the State's

---

[2]Prior to the enactment of the Juvenile Justice Reform Provisions of 1998, an "admission" in juvenile court was the equivalent of a guilty plea. See *People v. Taylor*, 221 Ill. 2d 157, 167 (2006); *In re A.G.*, 195 Ill. 2d 313, 316 (2001).

Attorney consent provision under section 5-615(1)(b) violates the separation of powers provision of the Illinois Constitution. Because the judgment of the circuit court should be affirmed on this ground, there is no need to reach the remaining constitutional issues and I express no opinion on them.

¶ 126  For the foregoing reasons, I dissent.

¶ 127  JUSTICE FREEMAN joins in this dissent.